TOWN OF DISH, William Sciscoe, Denise Sciscoe, Eric Dow, Angela Dow, Robert Draper, Michelle Draper, John Harris, Kimberly Harris, Charles Pegg, Geraldine Pegg, Cody Petree, Alice Randall, Johnny Reames, Jeanette Reames, Margaret H. Wagner, Jane Wagner, Tim Zimmerman, and Tracy Zimmerman, Petitioners and Cross-Respondents,

v.

ATMOS ENERGY CORPORATION, Enbridge Gathering (North Texas) L.P., Energy Transfer Fuel, L.P., Enterprise Texas Pipeline, L.L.C., and Texas Midstream Gas Services, L.L.C., Respondents and Cross-Petitioners

No. 15-0613

Supreme Court of Texas.

Argued March 1, 2017

OPINION DELIVERED: May 19, 2017

Richard O. Faulk, Hollingsworth LLP, Washington DC, for Amici American Chemistry Council, American Coatings Association, American Foundry Society, Association of American Railroads, Council of Industrial Boiler Owners, Metals Service Center Institute, National Association of Manufacturers.

David F. Johnson, Joseph P. Regan, Winstead PC, Fort Worth, Evan Andrew Young, Carlos R. Romo, Baker Botts LLP, Austin, Karen S. Precella, Haynes & Boone, L.L.P., Fort Worth, Robert K. Wise, Andrew James Szygenda, Lillard Wise Szygenda PLLC, Dallas, Roger Clyfton Diseker, Clark Rucker, Kelly Hart & Hallman LLP, Fort Worth, George Parker Young, Vincent P. Circelli, Circelli, Walter & Young, PLLC, Fort Worth, Hunter Allen, Jonathan B. Rubenstein, Baker Botts L.L.P., Dallas, for Petitioners.

Kirk Matthew Claunch, James (Jim) R. Claunch, The Claunch Law Firm, Fort Worth, James D. Piel, James D. Piel, P.C., Southlake, for Respondents.

Justice Brown delivered the opinion of the Court.

The energy companies in this case own four natural-gas compressor stations and a metering station just outside the Town of Dish.[1] Residents began complaining about the noise and odor emanating from these facilities as early as 2006, but did not sue until 2011. We hold that the two-year statute of limitations bars their claims. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's take-nothing judgment.

## I

The four compressor stations are adjacent to one another just outside the Town of Dish and within a half-mile of the residents' properties. Enbridge Gathering's compressor station came online in February 2005; Atmos Energy's in June 2006; Energy Transfer's in February 2007; and Texas Midstream's in May 2008. Together, these independently owned compressor stations are often referred to as the Ponder station.

Enterprise Products completed its nearby metering station in June 2009. Enterprise agrees limitations bars the residents' claims. But Enterprise further contends that as its metering station is not part of the Ponder station and its operations are

---

1. The Town of DISH, formerly known as the Town of Clark, changed its name in 2005 in exchange for complimentary satellite television service for its residents provided by the DISH Network. For purposes of this opinion, we forego naming the town in all caps.

altogether different from those of the other energy companies, it could not have contributed to the sources of the residents' complaints.

■■■ The Town of Dish and eighteen of its residents sued the energy companies on February 28, 2011, alleging trespass and nuisance injuries.[2] The trial court granted a series of summary-judgment motions brought by the energy companies on various grounds, including limitations. Although residents first complained about the Ponder station no later than 2006, and all of the energy companies' compressors were online by May 2008, the residents argue their claims did not accrue until the Ponder station was "completely finished" in the summer of 2009. (The residents maintain Enterprise's metering station, which came online in June 2009, is part of the Ponder station.) According to the residents' brief, it was after "the full force and cumulative effect of all of the parts of the completed [Ponder station] came to bear" that they "felt that a nuisance and trespass was occurring and that a substantial interference with their property use and enjoyment was taking place."

In eighteen separate but mostly identical affidavits, the residents attest they noticed a "significant change in the noise being emitted" from the Ponder station from September 2009 to early 2010. Before that, each resident stated, "[T]he noises were occasionally loud and sometimes annoying, but I did not feel they rose to the level of a nuisance." The residents also stated that "until disclosure of the findings of the Wolf Eagle Report," a September 2009 environmental study the residents commissioned, they were unaware of the

"dangerous substances that were being emitted into the air from the facilities."

The court of appeals reversed the trial court on limitations, holding that the energy companies failed to prove as a matter of law that the residents' claims accrued before February 28, 2009. 519 S.W.3d 171, 2015 WL 3463490 (Tex. App.—Amarillo 2015) (mem. op.). In its view, the energy companies "failed to address the synergistic effect their individual activities might have had on the overall condition being addressed by [the residents'] claims." *Id.* at 186 n. 13, *10 n. 13. We granted review.

## II

The court of appeals' opinion addresses a host of issues we do not reach because we dispose of the entire case on limitations. But, because it factors into the statute-of-limitations issue, we must address Enterprise's argument that its metering facility does not contribute to the Ponder station's alleged noise and odors.

At the trial court, Enterprise filed a summary-judgment motion on traditional and no-evidence grounds, arguing in part that no evidence shows its metering station could be a source of the residents' complaints. Enterprise claims its metering station is a "closed-in system" that neither vents gas nor creates noise that is audible offsite. The station includes no compressors, diesel engines, or condensate tanks. Instead, it "merely contains above-ground sections of piping with access points for metering, cleaning, and maintaining the pipeline." Moreover, it services "sweet gas," which "either does not contain hazardous air pollutants or contains [them] in such minuscule quantities that they are hardly cognizable." And because sweet gas

---

2. Trespass is a cause of action–generally, an intentional tort. *See Stinson v. Fontenot*, 435 S.W.3d 793, 793 (Tex. 2014) (per curiam). But as we clarified in *Crosstex North Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 594–95 (Tex. 2016), nuisance is not a cause of action, but a type of legal injury.

does not include certain potentially harmful compounds, "the gas is not treated or odorized" and so would not betray an odor "even if there were emissions." And as the station has no pressure-relief valve, "it does not vent natural gas into the atmosphere during overpressure situations." Enterprise contends the residents' summary-judgment response fails to address this unique no-evidence summary-judgment ground.

The trial court granted Enterprise's summary-judgment motion but the court of appeals reversed, holding the residents' summary-judgment evidence—specifically, the residents' affidavits and the Wolf Eagle report—raises "at least a scintilla of evidence that [the residents] were harmed by noise, odors, light, and hazardous chemicals emanating from [the energy companies'] facilities." 519 S.W.3d at 190. The court of appeals then concluded that "the allocation of responsibility" among the energy companies is "a matter laden with fact issues." *Id.*

This misses the point. Enterprise does not argue it emits less than the other companies; it maintains its facility is incapable of contributing to the complained-of conditions. In the face of Enterprise's no-evidence point, the court of appeals cannot simply conclude that some evidence supports the claims against the companies as a group and simultaneously ignore Enterprise's insistence it is not part of that group.

Enterprise presented evidence showing its facilities are fundamentally different from the other energy companies' and that a metering station cannot be a source of the residents' complaints.[3] The residents have offered no evidence refuting Enterprise's position. Boilerplate language in their affidavits that each "noticed a signifi-

cant change in the noise being emitted" from the Ponder station in late 2009 to early 2010 does not counteract Enterprise's evidence that it could not have contributed to that change. Nor can the Wolf Eagle report, which tested the air around the Ponder station for "volatile organic compounds," "hazardous air pollutants," and "tentatively identified compounds," create a fact issue as to whether Enterprise produces any of those compounds.

More than a scintilla of evidence in the residents' affidavits and the Wolf Eagle report may support their claims generally, but no evidence rebuts Enterprise's contention it is not one of the alleged offenders. As the residents never responded to Enterprise's no-evidence point, the trial court properly granted Enterprise's summary-judgment motion. Tex. R. Civ. P. 166a(i) ("The court must grant the [no-evidence summary-judgment] motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.").

## III

We now address the energy companies' limitations argument. The relevant limitations period is two years. *See Nat. Gas Pipeline Co. of Am. v. Justiss,* 397 S.W.3d 150, 153 (Tex. 2012). Dish and its residents sued on February 28, 2011, so their alleged claims must have accrued no earlier than February 28, 2009. The energy companies bear the burden to prove this defense. *See KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex. 1999) ("A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense.").

---

**3.** As Enterprise moved for a no-evidence summary judgment on this ground, it need not

have presented any evidence of its own. *See* Tex. R. Civ. P. 166a(i).

 A cause of action accrues "when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). And "[a] permanent nuisance claim accrues when the condition first 'substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities.' "[4] *Justiss*, 397 S.W.3d at 153 (quoting *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269–70 (Tex. 2004)). Similarly, and "[a]ssuming that entry of photons, particles, or sound waves can constitute trespass," a trespass claim accrues once "known injury begins." *Schneider*, 147 S.W.3d at 292; *see also Tenn. Gas Transmission Co. v. Fromme*, 153 Tex. 352, 269 S.W.2d 336, 338 (1954) (claim for trespass based on flow of polluted water onto neighboring land accrued "the moment water from the [defendant's] plant began to flow upon [plaintiff's] land"). "As with many other common-law claims, the accrual date is not defined by statute, but is a question of law for the courts." *Schneider*, 147 S.W.3d at 270.

 The energy companies argue their summary-judgment evidence establishes that Dish officials and residents in 2006 began making the same complaints alleged in this case. Those complaints, which included litigation threats, became the subject of public meetings and widespread media coverage. The last compressor came online in May 2008, and operations at the Ponder station have actually declined since 2009.[5] If the residents' claims accrued at all, they did so before February 28, 2009.

Dish and its residents argue they suffered no legal injury until the Ponder station was "completely finished" in the summer of 2009 when Enterprise's metering station came online.[6] But no evidence shows Enterprise's metering station contributed to the source of the residents' complaints. That leaves only two evidentiary bases for the notion that a change in Ponder station operations occurred in the summer of 2009: the residents' subjective beliefs reflected in their affidavits and the Wolf Eagle report. We will address both.

 Notwithstanding the discredited argument that the Ponder station was not "completely finished" until the summer of 2009, the last compressor undisputedly came online in May 2008. Claims for nuisance "normally do not accrue when a potential source is under construction," but "once operations begin and interference occurs, limitations runs against a nuisance claim just as any other." *Schneider*, 147 S.W.3d at 279. Trespass claims are no different. And although completion of construction is not dispositive of an accrual date, it is a logical starting point, as "plaintiffs will usually know of unreasonable discomfort or annoyance promptly." *Id.*

The evidence shows that if limitations did not begin to run when construction was completed, it began to run before. In the fall of 2006, with just the Atmos compressor station online, Dish residents invited Atmos representatives to a town meeting

---

4. In this case it is undisputed that the nuisance alleged by the residents is permanent rather than temporary.

5. Evidence shows the number of compressor engines Enbridge used has changed over time, from a peak of three engines in 2006 to just one in January 2011. The amount of natural gas that station processed peaked in August 2009 and has declined since then.

6. The residents contend Energy Transfer may have added a second dehydrator in summer of 2009. No evidence supports this contention.

to discuss noise and odor complaints. The meeting apparently did not resolve residents' concerns. In January 2007, Calvin Tillman, a Dish resident and the town's eventual mayor, sent an e-mail to Dish council member William Sciscoe and other residents regarding a recent meeting with Atmos representatives. He stated:

[I] think the only way to get Atmos to act is through civil litigation. I believe that Atmos would very easily be found liable for the damages they are doing in our lives, and preventing us from enjoying our property with the noise and smell, and destroying our property values.... Everyone of us has been affected by the noise and smell in some manner. Whether it is sleeping, enjoying sitting on our porches in the evening, or prevented someone from using a business in this community, we are entitled to receive something for our damages.... I will be contacting some attorneys that have been referred to me in the next few days. I will attempt to get them to talk to us as a group in my home.

On January 15, 2007, Tillman, copying media outlets, sent an e-mail to Atmos claiming that "[t]he noise produced by these engines has caused several complaints to your companies," which led to a town meeting. He threatened: "I am currently looking at ways in which we can force [you] to do what [you] should have been done months ago," concluding that "we will do what we have to do to protect our property from your atrocious noise." Tillman soon advised Sciscoe and others that he had "found some options for a civil suit," that there "may [be] a good case for damages now," and that he would "contact those who wish to participate." He further urged recipients of his e-mail to call an Atmos representative about the noise. Also in January 2007, Sciscoe notified Atmos that "you are interfering with my rights"

and that Atmos's operations were "damaging my life, the lives of my family, and the enjoyment of my property." During the same month, another resident, Tony Earle, complained about the "how the roar swirls around the homes and buildings in the neighborhood." He feared he would be unable to sell his home.

In March 2008, now with two compressor stations online, Sciscoe wrote in an e-mail to several recipients that "these people have come in and transformed [the area into] a living hell with unbearable, unending noise from thundering compressor engines, noxious fumes, blazing alarms, and roaring blast of gasses released into the air, louder than a jet engine at maximum takeoff thrust." He added he had "encouraged the citizens of our community to run not walk to an attorney," and indicated a "group of us citizens" had already met with one about the case. Meanwhile, Sciscoe stated he was "trying to get some action from the TCEQ." The same month, another resident, Greg Brinkley, wrote to Sciscoe urging a class-action lawsuit and reporting that his "whole family has experienced various respiratory ailments of late, that none of us ever had before."

The residents' complaints indeed led to a Texas Commission on Environmental Quality investigation in April 2008, one month before the Ponder station's final compressor went online. TCEQ found no "nuisance odor" and "no violations." Following its initial investigation, TCEQ installed an air-monitoring system that registered hourly air samples for 45 targeted volatile organic compounds near the Ponder station. TCEQ concluded "there have been no chemicals measured above levels of concern." Beyond the continuous monitoring, TCEQ collected "instantaneous canister samples" at multiple locations in and around the Ponder station at least

seven times in 2010 and 2011 because of citizen complaints about a "strong natural[-]gas odor." TCEQ concluded from these tests that the volatile organic compounds "were either not detected or were detected below levels of short-term health and/or welfare concern."

Also in response to resident complaints, in 2009 the Texas Department of State Health Services tested twenty-eight Dish residents for potential exposure to volatile organic compounds. The department tested the residents' blood and urine, as well as the tap water in their homes, but found no evidence of exposure to harmful pollutants. Testing showed their exposure to the tested-for contaminants was no higher than that of the general population. The only residents with higher levels of benzene—one of the emissions complained of in this case—were cigarette smokers.

Yet complaints persisted. In December 2008, resident Judy Caplinger wrote to Tillman about the "complete disruption" from the "constant roar" emanating from the Ponder station. And Tillman continued arguing the residents' case. On January 17, 2009, noting an "increase" in "the odor around the compressor site," Tillman stated he had filed complaints with the Texas Railroad Commission and threatened to "escalate this." The same month he reported to the Railroad Commission a "horrendous odor" constituting a "nuisance" that he "[did] not intend to tolerate." He also complained to the Texas Pipeline Association and state legislators, and solicited media coverage of the residents' complaints. Yet no legal action was taken until more than two years later.

The residents argue the individual statements of just a few people should not control their claims' accrual date. But the e-mail traffic among Dish's residents establishes more than isolated beliefs; they establish that the Ponder station's noise and odor was a community-wide concern. Beginning in 2007, Tillman's and Sciscoe's e-mails were sent to groups of other residents as updates on meetings with energy-company representatives and calls to action. Town meetings were held as early as 2006. Media coverage followed. State regulators investigated in 2008 and 2009 based on resident complaints. Counsel retained by the Town of Dish contacted Atmos at least once concerning its activities and raised the possibility of litigation. Although the residents' perceptions of the noise and odor coming from the Ponder station may have varied, the evidence shows they all lived between a quarter- and a half-mile from the Ponder station, and no evidence indicates their properties were affected differently. Any legal injury that occurred did so at least on completion of all the compressor stations in May 2008. Indeed, based on the record before us, injury possibly occurred earlier than that. Yet the residents did not sue until over two and a half years later.

The residents' arguments that their claims accrued in the summer of 2009 can be divided into three categories. First, they argue they did not experience the full brunt of the Ponder station's operations until it was finally completed (which they allege was in June 2009 when the Enterprise metering station came online). Second, they argue their eighteen individual affidavits stating the problems became substantially worse in late 2009 to early 2010 amount to some evidence that their claims did not accrue until then. And third, they cite the Wolf Eagle report as the first time they became aware dangerous chemicals were in the air.

Having already held no evidence demonstrates that the addition of Enterprise's metering facility elevated a mere annoyance to a legal nuisance, we turn to the plaintiffs' affidavits and the Wolf Eagle

report. Most of the affidavits are substantively identical. Tillman's and Sciscoe's are the exceptions; their affidavits contain additional information based on their dealings with the energy companies as elected officials and organizers of the residents' opposition. The remaining residents' affidavits uniformly assert the following:

Until the issuance of the Wolf Eagle Report and its presentation to residents of the Town of [Dish], the conduct and operations of [the energy companies] seemed tolerable, if occasionally annoying, and I did not consider them to have risen to the level of a nuisance or have any knowledge that those operations resulted in a trespass of their hazardous emissions into the air above my property. Until the disclosure of the findings of the Wolf Eagle Report, I was not aware that these dangerous substances that were being emitted into the air from the facilities ... were finding their way to my property where I am exposed to them and must smell their foul odor. Prior to the disclosure of the Wolf Eagle Report, a report prepared by a neutral party not affiliated with or working closely with the oil and natural gas industry, the information provided to me and other residents of the Town of [Dish] by [the energy companies] was that there were no hazardous emissions ... and that I and other residents were not being exposed to dangerous substances that reached our homes and properties through the air.

The residents give different dates spanning the summer of 2009 to early 2010 during which they attest noise and odor from the Ponder station became markedly worse. They uniformly assert that:

Prior to that time, the noises were occasionally loud and sometimes annoying, but I did not feel they rose to the level of a nuisance or feel that they had or would result in a diminution of the value of my home and property or deprive me of the ability reasonably to use and enjoy my home and property.

The energy companies argue that the residents' reliance on the Wolf Eagle report [7] is a backdoor attempt to invoke the discovery rule, which the residents did not plead. *KPMG Peat Marwick*, 988 S.W.2d at 748 (holding a defendant moving for summary judgment on limitations must negate the discovery rule "if it applies and has been pleaded or otherwise raised"). We agree. Ample evidence shows the residents were concerned about possible air contaminants long before the Wolf Eagle report. Indeed, the residents successfully implored state regulators to investigate their air quality. The residents' statements that they were "not aware" of the allegedly dangerous substances the Wolf Eagle report documents do not amount to proof of when a legal injury occurred. At most they are allegations that the residents did not yet comprehend the full extent of their injury. The residents do not attempt to explain why the nature of these substances was inherently undiscoverable, particularly after years of vociferous complaints. *See Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (accrual may be deferred "if the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable") (internal

---

7. The Wolf Eagle report concludes that: "Air analysis performed in the Town of [Dish] confirmed the presence in high concentrations of carcinogenic and neurotoxin compounds in ambient air near and/or on residential properties. The compounds in the air indicate quantities in excess of what would normally be anticipated in ambient air in an urban residential or rural residential area. Many of these compounds verified by laboratory analysis were metabolites of known human carcinogens and exceeded both Short-term and Long-term effective screening levels (ESL) according to TCEQ regulations."

quotations omitted). If anything, the Wolf Eagle report shows the residents were already on notice of their claims, or at a minimum had sufficient knowledge to be put on inquiry notice of them, well before they received the report. *See Gonzales v. Sw. Olshan Found. Repair Co.*, 400 S.W.3d 52, 58 (Tex. 2013) (recognizing that "once a claimant learns of a wrongful injury, the statute of limitations begins to run even if the claimant does not yet know the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it") (internal quotations and alterations omitted); *see also Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 436 (Tex. App.—Fort Worth 1997, pet. denied) ("[K]nowledge of facts that could cause a reasonably prudent person to make an inquiry that would lead to discovery of the cause of action is in the law equivalent to knowledge of the cause of action for limitation purposes.") (internal quotations omitted).

■■■ Nor can the residents' subjective beliefs set their accrual date. The residents argue that "the accrual date of a nuisance claim turns on the sensibilities of the [p]laintiffs and their perceptions." But that is not the law. A condition is a nuisance when it substantially interferes with "the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003). And "unreasonableness must be determined based on an objective standard of persons of ordinary sensibilities, not on the subjective response of any particular plaintiff." *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 596 (Tex. 2016). The plaintiffs' testimony matters. But an accrual date must be based on objective evidence, not bare, subjective attestations.

The residents base much of their limitations argument on this Court's decision in *Natural Gas Pipeline Company of America v. Justiss*, 397 S.W.3d at 153–55. *Justiss* also involved complaints about a compressor station's noise and odor. The residents in *Justiss* began complaining shortly after the compressor went online in 1992, but did not sue until 1998. We considered whether sufficient evidence supported the jury's finding that the plaintiffs' claims accrued on January 12, 1998. In so doing, we noted that claims for nuisance involving "largely subjective criteria like smell and sound" entail a more "fact dependent" analysis. *Id.* at 155. Accordingly, we deferred to the jury's determination. Evidence supporting the verdict included not only residents' testimony that conditions worsened in 1997 and 1998, but also a postal worker's testimony that the smell became so "unbearable" in the late '90s that he asked to be assigned to another route. *Id.* at 154. Additionally, the jury heard evidence that TCEQ cited the defendant for a "Category 5 odor violation"—the most severe possible—just two months before the residents sued. *Id.* at 152.

This case is similar in that complaints about the compressor station causing "total frustration and torment" arose long before two years prior to suit. *See id.* And the defendant pipeline company in *Justiss* likewise argued that "there would be no statute of limitations for permanent nuisance if a claim could be 'revived' by evidence that conditions worsened." *Id.* at 155. The difference between these cases, however, is that in *Justiss* objective evidence corroborated the plaintiffs' claims that conditions worsened in 1997 and 1998. *Justiss* does not stand for the proposition that mere subjective affidavit evidence can defeat a limitations defense. If that were the rule, a plaintiff's bare, subjective assertions could always set the accrual date.

The energy companies have proven that any legal injury the residents suffered commenced, at the latest, in May 2008. There is no objective evidence showing that the complained-of conditions worsened in the summer of 2009. Even if they did, the residents' claims had already accrued more than two years before they sued.

\* \* \*

The trial court properly disposed of this case on summary judgment. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's take-nothing judgment.