# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00272-CV

---

**Nima Amini, Appellant**

**v.**

**Spicewood Springs Animal Hospital, LLC; and Dr. Barak Benaryeh, Appellees**

---

**FROM COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY**
**NO. C-1-CV-17-010712, THE HONORABLE ERIC SHEPPERD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This appeal explores the application of the Texas Citizens Protection Act (TCPA) to a barking-dog dispute. *See* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011.[1] The appeal arises from a lawsuit filed against appellant Nima Amini by appellees Spicewood Springs Animal Hospital, LLC and Dr. Barak Benaryeh. Amini owns a condominium at the Neely's Canyon condominiums (NCC) near both the hospital's property and a strip of land owned by NCC and leased to the hospital. Starting in 2014, Amini began to complain about being disturbed by barking dogs. Benaryeh, the owner of the hospital, arranged to have a sound wall built, which allayed Amini's complaints for a few months. Amini then began to complain about noise related

---

[1] The TCPA was amended in the 2019 legislative session, but those amendments do not apply to this lawsuit, which was filed before the amendments' effective date. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 11, 12, 2019 Tex. Gen. Laws 684, 687 (amendments to TCPA apply "only to an action filed on or after" September 1, 2019).

to garbage trucks picking up the hospital's trash. Amini complained to Benaryeh; other hospital staff members; NCC's property manager, Mike Hill; the City of Austin's zoning department; the City's online noise complaint system; and his City Council representative. The hospital and Benaryeh eventually sued Amini for tortious interference with an existing contract, business disparagement, and private nuisance, and Amini filed a motion to dismiss under the TCPA. *See id.* § 27.003. The trial court did not rule on Amini's motion, which resulted in its being deemed denied by operation of law, and Amini filed this interlocutory appeal. *See id*. § 27.008. As we explain below, we will reverse the denial of Amini's motion to dismiss and remand the case to the trial court for further proceedings.

## STANDARD OF REVIEW

The TCPA is intended to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law" while protecting a person's right to file a meritorious lawsuit for a demonstrable injury. *Id*. § 27.002; *Hersh v. Tatum*, 526 S.W.3d 462, 466 (Tex. 2017). Thus, a party, usually a defendant, may file a motion to dismiss the "legal action," showing by a preponderance of the evidence that the lawsuit against him is based on, relates to, or is in response to his exercise of his right of free speech, right to petition, or right of association. *See* Act of May 21, 2011, 82nd Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 962-63 (former Tex. Civ. Prac. & Rem. Code §§ 27.003(a), .005(b)); *Hersh*, 526 S.W.3d at 466. If the movant shows that the TCPA applies, the trial court "shall dismiss" the legal action unless the nonmovant "establishes by clear and specific evidence a prima facie case for each essential element" of each claim at issue, and it shall dismiss even in the face of a prima facie case if the

2

movant establishes by a preponderance of the evidence a valid defense to the claim. *See* 2011 Tex. Gen. Laws at 963 (former Tex. Civ. Prac. & Rem. Code § 27.005(b)-(d)).

"Exercise of the right of free speech" under the TCPA is "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code § 27.001(3). As applicable to this appeal, a "matter of public concern" is an issue related to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace. *See* 2011 Tex. Gen. Laws at 962 (former Tex. Civ. Prac. & Rem. Code § 27.001(7)). Texas courts have repeatedly noted and discussed the incredible breadth of the language used in the TCPA. *See, e.g.*, *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018); *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015); *Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 84-85 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 706 (Tex. App.—Amarillo 2018, pet. denied); *Cavin v. Abbott*, 545 S.W.3d 47, 63-64 (Tex. App.—Austin 2017, no pet.); *Garton v. Shiloh Vill. Partners, LLC*, No. 12-16-00286-CV, 2017 WL 6884451, at *3 (Tex. App.—Tyler Aug. 23, 2017, no pet.) (mem. op.); *Serafine v. Blunt*, 466 S.W.3d 352, 365-380 (Tex. App.—Austin 2015, no pet.) (Pemberton, J., concurring).

### FACTUAL SUMMARY[2]

Amini averred that when he bought his condo in 2012, he thought "the boarding facility at [the hospital] was chiefly indoors" and was not concerned about occasional animal noise. In 2013, he noticed "increased barking noise" in the early mornings and evenings to such a degree that it started to affect his sleep and his enjoyment of his home, and in early 2014, he

---

[2] Our recitation of the facts is taken from the parties' pleadings, motions, and affidavits.

3

emailed the hospital to complain. In September 2014, Benaryeh informed Amini that the hospital would build a sound wall to address the complaints, and when the wall was finished in November, Amini thanked Benaryeh, saying in an email that he had noticed a "significant reduction in the noise level."

In early 2015, Amini started again being awakened throughout the night because the hospital had placed its dumpster on the land leased from NCC,[3] in an area where the sound wall did not reach, and its garbage collection "started consistently to occur . . . between the hours of 1:00AM and 5:00AM." In November 2015, Amini emailed Benaryeh to complain, copying NCC's property manager, Mike Hill, and the early morning noise stopped for several months. In about March 2016, Amini again heard "excessive dog barking" and noticed that the hospital had begun to exercise dogs on the leased land, where the sound wall did not reach. He also heard barking coming from an enclosed yard "less than 100 feet from" his condo.

Amini averred that through the first half of 2017, he and appellees' attorney discussed the possibility of appellees buying Amini's condo. Amini said that although he "really did not want to sell," he agreed to "explore the option" because of his ongoing frustration. By June, however, it "became clear" that the parties could not agree on a price, and on June 9, 2017, Amini got a letter from appellees' attorney, which he characterized as "express[ing] disapproval with my voiced concerns about [the hospital's] use of the Leased property, claim[ing] incorrectly that I professed a unique sensitivity to sound, and express[ing] his displeasure for my refusal to accept Dr. Benaryeh's offer to purchase my home." That same

---

[3] The lease provides that the land, described as "a paved parking area," could be used by the hospital "for a parking lot and a driveway . . . and for no other purpose." As we will explain, Amini complained repeatedly about the hospital's use of the property, which he asserted was in violation of its lease with NCC.

4

month, Amini again emailed Hill and Benaryeh to state that "there were numerous dogs barking and creating excessive noise on the" leased land. In August, Amini emailed appellees' attorney and said in part, "Due to your threats I will protect myself by now filing a lawsuit against the HOA to address the [breach] of contract of the lease agreement." He also said that the hospital's real-estate broker should "start looking for commercial properties zoned for dog kenneling."

According to Amini, the hospital resumed its early-morning trash collection in mid-2017. In early September 2017, Amini emailed Hill and Benaryeh that he believed that the hospital was in violation of its lease with NCC and again threatened legal action against NCC if the situation was not resolved. Benaryeh responded, asking Amini to meet to discuss possible solutions and explaining that he had contacted several trash companies; that commercial trash "is collected at night" because of the kinds of trucks used; and that although he could explore moving the dumpster, "it would be complicated." Benaryeh also said that the hospital was not breaking any ordinances and that the City had investigated at least one of Amini's complaints and found it to be "unjustified." Amini responded that he was not interested in a meeting; that he wanted "peace and quiet between the hours of 10pm-7am"; that a City code enforcement officer had told him to file a nuisance complaint rather than contacting the code department; that the NCC handbook prohibits loud noise on the property; that the late-night noise was "being generated on the property that Neely's Canyon owns"; and that he was being "forc[ed]" to sue NCC's homeowners' association (HOA).

Amini averred that he was awakened by noise from the hospital's garbage collection about a week later, in early October 2017, and that he "allowed [his] frustration to get the best of [him]" and sent the same email—complaining that he had been woken up—eleven times to both Benaryeh and Hill at about 4:45 a.m. Later that day, he emailed Benaryeh, "The

5

next time this happens I will drive down to your house and start honking my horn in the middle of the night while I am parked in the street so that you and your neighbors can get a taste [of] what I am dealing with. You have been warned." Two days later, Amini emailed Hill to say that the hospital's trash collection had occurred at 1:00 a.m. He reiterated his belief that the leased property was supposed to be used only as a parking lot and told Hill he would document each such occurrence "until the court date." At the end of October, Amini emailed Hill and Benaryeh again[4]—sending the same email multiple times—to report another early-morning trash collection. He complained about what he viewed as the hospital's ongoing violation of the lease and asked Hill to provide an explanation of "how this is not a violation of the lease." In November 2017, Amini climbed onto an NCC parking structure (where he apparently did not have permission to be) and videotaped a hospital employee while the employee was walking dogs on the leased property. The hospital moved its dumpster in November, and Amini averred that he had not been woken by noise from trash collection since.

As for Amini's communications with the City of Austin, he complained of a zoning violation in June 2013 and then emailed the Zoning and Platting Commission in November 2013, explaining that since the hospital obtained City permission to operate a dog kennel in the last year, he had submitted "10 noise complaints . . . due to numerous dogs barking between 7-8 AM every single morning, including Saturdays and Sundays (they are barking right now as I type). Prior to the kennel this facility only operated as an animal clinic (which I think is appropriate). Since the changes the noise has become unbearable and it isn't fair for someone to not be able to sleep [past] 7 AM in their own home on the weekends." A City inspector

---

[4] Amini said he also included some of the hospital's staff members on the email in the hope that telling someone else "would cause something to change."

determined that there were no code violations at the hospital's property. Amini contacted the City again in mid-2017, complaining in June and July about overnight garbage collection. A City employee went to the hospital, observed that the dumpster and its location were "compliant," and asked the hospital to arrange to have its trash collected after 6:30 a.m. In November and December 2017, Amini filed complaints that the hospital was violating the City code by exercising dogs outside rather than keeping them "totally within a building." Amini averred that he also visited the Zoning Office on several occasions and that he was told by City employees "that dogs were not allowed to be outside at [the hospital] and that I should file a complaint with" the City and that "a sound study is an option to pursue with the City." Amini also complained to his City Council representative.

In November 2017, the hospital sued Amini for tortious interference with an existing contract, business disparagement, and private nuisance. Amini filed a motion to dismiss under the TCPA, asserting that the Act applied because appellees' claims against him were based on his exercise of his rights to petition and free speech and that his complained-of communications were related to issues of health and safety; issues of economic, environmental, and community welfare; and a service in the marketplace. *See* Tex. Civ. Prac. & Rem. Code §§ 27.001, .003. The hospital then filed an amended petition adding Benaryeh as a plaintiff, dropping its claims for tortious interference and disparagement, and asserting claims for private nuisance on behalf of both the hospital and Benaryeh. Amini filed a supplemental motion to dismiss addressing the amended petition.

Appellees responded, arguing that the TCPA is unconstitutional and that they could establish as "affirmative defenses" to Amini's motion to dismiss: quasi-estoppel, because Amini accepted the benefits of the sound wall; and unclean hands, in the form of "bad faith

7

claims, negotiation by duress, and harassment and revenge." Appellees also insisted that Amini's motion to dismiss was "of no procedural effect" as to their superseded petitions and that the TCPA could not be applied against their abandoned claims for tortious interference and business disparagement. As for their live pleading, appellees argued that Amini had not shown that the TCPA applied to their claims for private nuisance, that Amini's conduct was not protected speech, and that even if the TCPA did apply, they could establish a prima facie case for each essential element of their claims. Appellees also filed a TCPA motion to dismiss Amini's motion to dismiss, seeking at least in part to "[d]emonstrate[e] the unreasonableness" of the TCPA and "the absurd and purpose-frustrating breadth of its application." The trial court did not rule on Amini's or appellees' motions to dismiss, resulting in their being deemed denied by operation of law. *See id*. § 27.008. Only Amini appealed.

**DISCUSSION**

The primary issues we must address in this appeal are whether the TCPA applies to appellees' live claims, whether it applies to appellees' abandoned claims, and, if it applies, whether appellees presented a prima facie case for each essential element of their claims.[5]

---

[5] Appellees also argue that the TCPA is unconstitutional and that its unconstitutionality "validat[es] the trial court's denial of Amini's motion." However, the denial of Amini's motion by operation of law cannot be viewed as a determination on appellees' challenge to the constitutionality of the overall statutory scheme, and we will not consider their constitutional arguments in this interlocutory appeal. *Cf. Abatecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL 3118601, at *15 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. denied) (mem. op.) (trial court did not rule on constitutional challenge when denying motion to dismiss, and appellate court could not address that challenge in interlocutory appeal from denial of TCPA motion); *Hearst Newspapers, LLC v. Status Lounge Inc.,* 541 S.W.3d 881, 894 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (in interlocutory appeal from denial of TCPA motion, appellate court lacked jurisdiction to consider separate order denying motion to declare TCPA unconstitutional).

*Application of the TCPA to abandoned claims*

Amini argues that his motion to dismiss applied to all of appellees' claims, including those omitted from their live pleading, and that appellees may not "escape" the TCPA by simply dropping two of their original claims. Appellees, on the other hand, contend that Amini has made contradictory arguments, arguing on appeal that his motion to dismiss is an affirmative request for legal relief that survived appellees' nonsuiting of two causes of action while arguing in the trial court that his motion was not "a procedural vehicle for the vindication of a legal claim." Appellees assert that Amini's motion to dismiss was of no effect against the abandoned claims and that he cannot recover attorney's fees related to those claims, regardless of whether appellees presented a prima facie case of their essential elements.

The nonsuit of claims challenged in a TCPA motion to dismiss does not "entirely moot" the TCPA motion because the movant may "continue to pursue their requests for attorney's fees incurred in defending those claims prior to their voluntary dismissal, as well as for the sanctions the Act would prescribe." *Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 293 (Tex. App.—Austin 2018, pet. denied); *see McDonald Oilfield Operations, LLC v. 3B Inspection, LLC*, 582 S.W.3d 732, 752 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *CTL/Thompson Tex., LLC v. Starwood Homeowner's Ass'n*, 390 S.W.3d 299, 300 (Tex. 2013)); *Gaskamp v. WSP USA, Inc.*, __ S.W.3d __, No. 01-18-00079-CV, 2018 WL 6695810, at *9 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet. h.); *Abatecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL 3118601, at *13 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. denied) (mem. op.); *Rauhauser v. McGibney*, 508 S.W.3d 377, 381 (Tex. App.—Fort Worth 2014, no pet.), *overruled on other grounds by Hersh*, 526 S.W.3d at 467.

Appellees also argue that because they dropped their disparagement and tortious interference claims, as opposed to nonsuiting their lawsuit altogether, the TCPA should not be applied to those claims. Although we might agree that "the policy of deterrence of the filing of non-meritorious lawsuits" would be better served by allowing a party facing a TCPA motion to amend its pleadings based on "the subsequent recognition of facts," the TCPA is not written to allow a party to escape its attorney's fee provisions by amendment or nonsuit, as, for instance, is the case with a motion to dismiss a baseless cause of action. *See* Tex. R. Civ. P. 91a (party may file motion to dismiss on grounds that claim has no basis in law or fact, and nonmoving party may nonsuit claim and avoid operation of rule and assessment of attorney's fees and costs). We hold that appellees' abandonment of two of their claims did not affect Amini's right to seek attorney's fees under the TCPA as to those claims. *See McDonald Oilfield*, 582 S.W.3d at 752 ("3B Inspection and the individual employees had an absolute right to nonsuit *any or all* of their claims, but their decision to nonsuit does not affect McDonald Oilfield's right to continue to pursue independent claims for affirmative relief." (emphasis added)); *Gaskamp*, 2018 WL 6695810, at *9-10 ("Appellants' motion was not 'moot' but remained pending as to WSP USA, Inc.'s claims even after those claims were nonsuited."). Thus, appellees' abandonment of their claims for tortious interference and business disparagement did not bar Amini from seeking TCPA remedies as to those claims. We next consider whether the TCPA applies to appellees' claims against Amini.

*Does the TCPA apply?*

All of appellees' claims—tortious interference with a contract, business disparagement, and private nuisance—arise out of Amini's complaints about noise emanating

10

from the hospital and, relatedly, the hospital's operations and use of the land it leased from NCC. They asserted that Amini had made repeated and "vociferous" noise complaints despite City inspectors checking on the complaints and never citing the hospital for any violations; that he "publishe[d] and air[ed] his grievances" "[v]ia *hundreds* of emails and phone calls, video footage, meetings, conversations and other communications"; and that he emailed Hill and NCC's HOA to threaten legal action if the HOA did not cancel the lease with the hospital. Appellees characterize Amini's behavior as "abusive, threatening, and harassing" and contend that their claims are related to this "tortious conduct," not to his exercise of his constitutional rights. Amini, on the other hand, argues that his communications related to matters of public concern because they involve "issues of health and safety, along with economic, environmental, or community welfare," explaining that they related to his and his neighbors' mental and emotional health and to appellees' interference with NCC resident property rights and the overall welfare of the NCC community. He also argues that his contacting the City was an exercise of his right to petition.

Despite appellees' characterization of Amini's behavior as "tortious," their claims arise from Amini's campaign of making noise complaints to Benaryeh, other hospital staff, the NCC homeowner's association and board of directors, and the City of Austin. In his emails, Amini stated that the noise was disturbing his sleep and enjoyment of his property and that other neighbors had also been "experiencing the same disturbance" by barking dogs and had been woken "in the middle of the night for quite some time now" by the garbage collection. He also sought assistance from the City in solving issues he believed arose out of the hospital's violation of noise or zoning ordinances. This case is similar to the facts as discussed by our sister court in *Garton*, 2017 WL 6884451, at *4-5, in that appellees' claims are based on facts "broader than

11

the alleged verbally abusive statements." Although Amini grew so frustrated that he allegedly used "inappropriate statements and conduct," the "underlying basis which prompted [his] actions was a matter of public concern." *See id.* At heart, appellees complain of Amini's repeated emails and complaints about the noise, regardless of the appropriateness of his language.

Given the broad language of the TCPA, we conclude that Amini showed that the conduct on which appellees base their claims—his repeated complaints that he and his neighbors were being woken over and over again by late-night noise from the hospital—was related to community well-being and, potentially, to health and safety and, therefore, was made in connection with a matter of public concern. *See* former Tex. Civ. Prac. & Rem. Code § 27.001(7). Except under very limited circumstances, the First Amendment protects speech, including speech that someone finds annoying or even abusive. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209-10 (1975) (First Amendment limits government from censoring speech, even when it "offends our esthetic, if not our political and moral, sensibilities"); *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 555 (Tex. 1998) ("Speech is protected even when the subject or manner of expression is uncomfortable."); *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 446 (Tex. 1998) (Gonzales, J., dissenting) ("The Supreme Court's First Amendment analysis has generally started with a presumption that all speech is protected. It has found expression falling within only a few very narrow categories of speech to lack significant First Amendment protection."). And, in the context of the first step of our TCPA analysis, asking whether the TCPA applies in the first place, we do not consider whether the communications were defamatory, harassing, or otherwise actionable. *See Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 204-05 (Tex. App.—Austin 2017, pet. dism'd) (whether

12

communication was improper and thus actionable is not relevant in first part of TCPA analysis); *Garton*, 2017 WL 6884451, at *6 (although defendant's "method and manner [of communicating her grievances] could be viewed as inappropriate," her statements "were made in the course of communicating a matter of public concern, which falls under the protection of the TCPA" for purposes of determining whether TCPA applies); *Rauhauser*, 508 S.W.3d at 384 n.4 ("proof of protected speech is not part of a defendant's initial burden under section 27.005(b) of the TCPA; instead, a plaintiff may offer proof of unprotected speech by a defendant as part of" establishing its prima facie case); *Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *5 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.) ("BCG contends that Kinney's statements do not relate to free speech because they were false and defamatory and thus not constitutionally protected," but whether statements were defamatory "is reviewable in the second part" of TCPA analysis). Amini also showed that his contacting the City to make noise or zoning complaints was related to the exercise of his right to petition. *See* Tex. Civ. Prac. & Rem. Code § 27.001(4); *State ex rel. Best v. Harper*, 562 S.W.3d 1, 13 (Tex. 2018); *Holcomb v. Waller County*, 546 S.W.3d 833, 839-40 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *Ramsey v. Lynch*, No. 10-12-00198-CV, 2013 WL 1846886, at *1-2 (Tex. App.—Waco May 2, 2013, no pet.) (mem. op.). Amini thus demonstrated by a preponderance of the evidence that appellees' claims, both abandoned and live, are based on, related to, or in response to his exercise of his right to free speech or his right to petition and that the TCPA applies, and the burden shifted to appellees to establish by clear and specific evidence a prima facie case for each essential element of each claim. *See* Tex. Civ. Prac. & Rem. Code § 27.005(b), (c); *Hersh*, 526 S.W.3d at 468.

Amini established that the TCPA applies to appellees' claims. Appellees were therefore required to present clear and specific evidence establishing a prima facie case for each essential element of their claims of tortious interference with a contract, business disparagement, and private nuisance.[6] *See* Tex. Civ. Prac. & Rem. Code § 27.005(c).

## Tortious interference with existing contract

The elements of tortious interference with an existing contract are: (1) an existing contract subject to interference, (2) and a willful and intentional act of interference with the contract (3) that proximately caused the plaintiff's injury and (4) that caused actual damages or loss. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). A defendant may negate liability by showing that his conduct was privileged or justified. *Id.* at 77-78. "To prevail on a tortious interference claim, a plaintiff must present evidence that the defendant interfered with a specific contract"—that "some obligatory provision of a contract has been breached." *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (quoting *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)).

In their response to Amini's TCPA motion, appellees presented the following argument as to the second element—willful and intentional interference:

---

[6] As we explained earlier, despite appellees having dropped their claims for tortious interference and business disparagement, the potential for Amini to recover attorney's fees related to those claims requires us to analyze his TCPA motion as to those claims, in addition to appellees' live claims for private nuisance.

The Plaintiff [the hospital] can meet its burden to prove willful and intentional interference. Because the proclaimed purpose of the litigation was an attempt to get the HOA to enforce his colorable right to enforcement of contractual provisions, if it is true as Plaintiffs' allege and can demonstrate, that the statements and conduct of Defendant go beyond the rightful exercise of those TCPA-protected rights into violative conduct, a reasonable fact finder could consider evidence of the wrongful conduct of Defendant against [the hospital], a fellow Member, sufficient to constitute breach of the contract by contravention of the mutual assent between Members to resolve differences under the contract by the means specified therein. Furthermore, the Members of the HOA share duties to one another and the common interests of the HOA organization as indicated by the Defendants himself and the HOA is in turn responsible and liable for the actions of Members as against other Members. A reasonable inference could be drawn that by violating the fiduciary, interest-oriented, and good faith dispute resolution duties arising out of the contract, that the contract was breached to [the hospital's] injury.

[HOA attorney] Connie Heyer's affidavit also establishes that in response to bad faith, intentionally and knowingly false statements by Defendant, the HOA was required to engage in investigations related to the complaint in compliance with its duty to Defendant as a Member causing inconvenience, delay, and expense and therefore injury to [the hospital], another Member. This is yet another example of the minimum quantum of evidence by which a reasonable inference that, because Defendant's independently wrongful conduct resulted in the breach of a duty arising out of a contractual relationship by making the HOA responsible for taking actions in the name of one Member which were detrimental to another Member when the complaining Member was acting in bad faith and with intent to cause injury (i.e. motivated by frustration), the contract between [the hospital] and the HOA was injuriously interfered with by the Defendant.

(Record citations omitted.)

Although appellees seem to assert that the hospital is a member of the HOA, the evidence in the record does not reflect that fact. And, regardless of whether Amini intended to harass Heyer or members of the HOA,[7] such action cannot be relied upon by *appellees* in their

---

[7] Heyer averred that she had exchanged numerous emails with Amini in her capacity as the HOA's attorney; that Amini had sent "duplicative emails to the Neely's Canyon HOA and his representatives" and made "numerous phone calls to the association and its representative despite a request that he not do so"; that Amini told Heyer that he would continue to contact her

claims against Amini. Finally and most importantly, the record does not reflect that NCC's lease with the hospital was terminated or was renegotiated to the hospital's detriment. Appellees did not establish a prima facie case of each essential element of tortious interference, and the trial court therefore erred in denying Amini's motion to dismiss as to that claim.

*Business disparagement*

To prevail on a business disparagement claim, which is similar to a defamation claim, the plaintiff must establish that (1) the defendant published false and disparaging information about the plaintiff's commercial interests, (2) with malice, and (3) without privilege, and (4) that the derogatory publication resulted in special damages to the plaintiff. *In re Lipsky*, 460 S.W.3d 579, 591-92 (Tex. 2015); *Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014).

Appellees asserted that Amini "engaged in publication of disparaging words" by making "duplicative reports and complaints to various bodies" despite knowing that his earlier complaints had been "categorically refused" because "all relevant authorities considered [the hospital] to be in compliance with all regulations or duties." They further asserted that Amini made "several untrue statements," including to hospital employees, claiming the hospital was violating lease, code, or zoning restrictions. Appellees acknowledged that Amini never mentioned the quality of the hospital's veterinary services but insisted that:

and the HOA until he received "an update with corrective measure or an action plan" or "an adequate response in writing"; that despite her request that Amini cease communications with her, he emailed her "a lengthy response, asserting his right to submit as many complaints regarding [the hospital] as he wishes"; and that she believed Amini "intended to annoy or harass me and/or other HOA representatives until he received a response he determined to be favorable."

16

the known false allegation that an animal medical service provider is in violation of relevant local and/or state authority regarding regulations of animal care facilities or property use is disparaging in the field of its practice even though it does not specially degrade the provision of its primary services because it demonstrates lax regulatory compliance in a field where regulatory compliance is essential to that practice.

In essence, appellees seem to argue that by complaining to Benaryeh, hospital employees, Hill, Heyer, and the City about the hospital's noise and use of the leased land, Amini disparaged the hospital's overall business practices and, by extension, its professional reputation.

A claim for business disparagement "does not seek to redress dignitary harms to the business owner, but rather redresses aspersions cast on the business's commercial product or activity that diminishes those interests." *Lipsky*, 460 S.W.3d at 591. The complained-of statements must be defamatory. *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 728 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), *disapproved of on other grounds by Lipsky*, 460 S.W.3d at 588, 591; *MKC Energy Invs., Inc. v. Sheldon*, 182 S.W.3d 372, 377 (Tex. App.—Beaumont 2005, no pet.); *American Energy Servs., Inc. v. Union Pac. Res. Co.*, No. 01-98-01264-CV, 2001 WL 953736, at *9 (Tex. App.—Houston [1st Dist.] Aug. 16, 2001, no pet.) (not designated for publication); *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 427 (Tex. App.—Waco 1997, writ denied). Appellees were therefore required to provide clear and specific evidence that Amini published defamatory information about the hospital's commercial product or activity that diminished the hospital's commercial interests. *See Lipsky*, 460 S.W.3d at 591; *MKC Energy*, 182 S.W.3d at 377. On this record, however, there is no evidence from which a fact finder could conclude that Amini's complaints somehow defamed or impugned the hospital's commercial product, activity, or reputation.

17

Nor did appellees establish a prima facie case as to damages. In their response to Amini's TCPA motion as to the element of special damages, appellees asserted:

> First, there is no requirement that special damages be specifically enumerated, especially at the early dismissal stage immediately following pleading. . . . Proof of lost sales, trade, or dealings is not a requirement but merely a series of examples of pecuniary loss; pecuniary loss includes any demonstrable financial injury proximately caused by the violative activity. A reasonable fact finder evaluating [the hospital's] evidence on its face could reasonably infer that Amini's complaints inducing the creation of the wall were motivated by the same malice and proximately caused by the leverage he wrongfully obtained in negotiations with [the hospital] by knowingly making repeated complaints already adjudicated by the respective exclusive authorities as baseless.

Although appellees seem to assert that their building of the sound wall should be considered special damages, the conduct they allege to be wrongful—Amini's "vociferous," "duplicative," and "harassing" complaints about noise and the hospital's use of the leased land—occurred after the wall was built.[8] Indeed, Amini averred that the building of the wall abated his initial complaints and that he only started to complain anew after the hospital started using areas of the leased land that were not shielded by the sound wall. "Bare, baseless opinions do not create fact questions" and are not "a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *Lipsky*, 460 S.W.3d at 592. Instead, an assertion of damages "must be based on demonstrable facts and a reasoned basis" rather than "general averments of direct economic losses and lost profits, without more." *Id*. at 593. Here,

---

[8] Amini complained in 2014 about being woken up by barking but then ceased his complaints for about a year after the wall was built. His complaints resumed in 2015, when the garbage collection began to disturb his sleep and the hospital began to exercise dogs in an area beyond the reach of the wall. In 2017, the frequency of his emails to Benaryeh and Hill escalated and he resumed filing complaints with the City.

18

as in *Lipsky*, the record is devoid of any specific facts illustrating how Amini's alleged remarks about the hospital's noise or code or zoning violations caused any special damages. *See id.*

Appellees did not carry their burden of bringing forth a prima facie case of at least two elements of business disparagement, and the trial court therefore erred in not granting Amini's TCPA motion as to that claim.

### *Private nuisance*

Initially, we note that "nuisance is not a cause of action, but a type of legal injury." *Town of Dish v. Atmos Energy Corp.*, 519 S.W.3d 605, 607 n.2 (Tex. 2017) (citing *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 594-95 (Tex. 2016)); *see also Crosstex*, 505 S.W.3d at 594-95 ("the term 'nuisance' does not refer to the 'wrongful act' or to the 'resulting damages,' but only to the legal injury—the interference with the use and enjoyment of property—that may result from the wrongful act and result in the compensable damages"); *Dealer Comput. Servs., Inc. v. DCT Hollister Rd, LLC*, 574 S.W.3d 610, 621-22 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("nuisance does not itself constitute wrongful conduct or cause of injury; rather, nuisance is a type of injury," and plaintiffs should thus allege "intentional conduct or negligence with respect to" alleged nuisance injuries); *St. Anthony's Minor Emergency Ctr., L.L.C. v. Ross Nicholson 2000 Separate Prop. Tr.*, 567 S.W.3d 792, 799 & n.8 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("A defendant can be liable for creating a nuisance based on negligence or other culpable conduct."); *Bolton v. Fisher*, 528 S.W.3d 770, 778 (Tex. App.—Texarkana 2017, pet. denied) (plaintiff sued for nuisance, but "[b]ecause nuisance is not a cause of action, these separate claims cannot stand"; although "the nuisance, or legal injury, alleged in Bolton's petition could have given rise to a cause of action,

19

such a cause of action was not" pled). Thus, because appellees did not plead an actual cause of action, their claim for "private nuisance" cannot stand. *See Bolton*, 528 S.W.3d at 778.

Even if we interpret their pleadings as asserting an actionable claim of negligent or intentional conduct giving rise to a nuisance injury, appellees have not presented a prima facie case that they suffered such an injury. A private nuisance "is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Crosstex*, 505 S.W.3d at 593 (quoting *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003)); *see also Bolton*, 528 S.W.3d at 778 ("A private nuisance affects an individual or a small number of individuals rather than the public at large." (quoting *Mathis v. Barnes*, 377 S.W.3d 926, 930 (Tex. App.—Tyler 2012, no pet.))). In evaluating whether an interference "is 'substantial' and causes 'discomfort or annoyance' that is 'unreasonable,'" so as to amount to a legal injury, we apply an objective standard. *Crosstex*, 505 S.W.3d at 594-95, 599.

Although a defendant may cause a nuisance injury by interfering with "a wide variety of the plaintiffs' interests in the use and enjoyment of their property," *see id*. at 596 ("It may, for example, cause physical damage to the plaintiffs' property, economic harm to the property's market value, harm to the plaintiffs' health, or psychological harm to the plaintiffs' 'peace of mind' in the use and enjoyment of their property."), we have not found cases in which emails or similar communications have been held to so substantially interfere with a plaintiff's use and enjoyment of its property as to be a nuisance. Nor have appellees cited any such cases.

Our survey of nuisance cases reflects situations in which a defendant is found to have caused a nuisance by causing flooding on the plaintiff's property, *see, e.g.*, *Barnes v. Mathis*, 353 S.W.3d 760, 763-64 (Tex. 2011); emitting noxious odors, *see, e.g.*, *Natural Gas*

20

*Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 154 (Tex. 2012); discharging water onto the plaintiff's land, *see, e.g.*, *Tennessee Gas Transmission Co. v. Fromme*, 269 S.W.2d 336, 338 (Tex. 1954); or invading the plaintiff's land with dust, noise, or bright lights, *see, e.g.*, *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269-70 (Tex. 2004). Essentially, the common thread through Texas nuisance jurisprudence is that the defendant has invaded the plaintiff's property by some physical means, creating a "condition" that substantially interferes with the plaintiff's use and enjoyment of its land.[9] *See Crosstex*, 505 S.W.3d at 593, 595-600; *Schneider Nat'l*, 147 S.W.3d at 273-77 (discussing various types of nuisances in discussing temporary and permanent nuisances); *Serafine v. Blunt*, No. 03-16-00131-CV, 2017 WL 2224528, at *5 (Tex. App.—Austin May 19, 2017, pet. denied) (mem. op.) ("private-nuisance claims typically involve an invasion of the plaintiff's property by light, sound, odor, or a foreign substance," and "aesthetic" nuisance claims are not recognized).

Appellees accused Amini of creating a nuisance by his repeated emails to Benaryeh, Hill, and others related to the hospital and NCC and his repeated complaints to the City, which resulted in multiple investigations. Even assuming that such conduct can rise to the level of causing a nuisance injury, appellees had the burden of showing clear and specific evidence that Amini's conduct interfered with appellees' use and enjoyment of their property in a

---

[9] In asking whether a defendant has caused a nuisance injury, the supreme court has instructed us to consider factors such as: the character and nature of the neighborhood; the parties' land usage and social expectations; the location of each party's land; the extent to which others in the area are using their land similarly; the "social utility of each property's usage"; the likelihood that the defendant's conduct will interfere with the plaintiff's use and enjoyment of its land; "the magnitude, extent, degree, frequency, or duration of the interference and resulting harm"; "the relative capacity of each party to bear the burden of ceasing or mitigating the usage of their land"; the timing of the conduct that created the conflict; the defendant's motive in causing the interference; and the interests of the community and the public at large. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 600 (Tex. 2016).

21

substantial and unreasonable way. *See Crosstex*, 505 S.W.3d at 595, 599. Although Amini's conduct might have annoyed and even inconvenienced appellees, when considered under the applicable objective standard, there is simply no evidence that the effect of Amini's behavior was "such as would disturb and annoy persons of ordinary sensibilities, and of ordinary tastes and habits." *Id.* at 596-99 (quoting *Sherman Gas & Elec. Co. v. Biden*, 123 S.W. 119, 120 (Tex. 1909)). Appellees continued to operate the animal hospital, there was no evidence that the hospital lost employees or customers, and although Benaryeh averred that he was concerned that Amini knew where he lived and would harass him at home, he did not provide evidence that Amini's emails substantially and unreasonably interfered with Benaryeh's use and enjoyment of his home. We hold that appellees did not present a prima facie case that Amini's conduct rose to the level of causing a nuisance injury. The trial court thus erred in failing to grant Amini's TCPA motion as to appellees' private nuisance claims.

### *"Affirmative defenses" to Amini's TCPA motion*

Appellees assert that they can establish two "affirmative defenses" to Amini's motion to dismiss: quasi-estoppel, because Amini accepted the benefits of the sound wall, and unclean hands in the form of "bad faith claims, negotiation by duress, and harassment and revenge." They argue that because Amini's motion to dismiss is a plea for affirmative relief, it is a "pleading" subject to the assertion of an affirmative defense under the rules of civil procedure,[10] and insist that because the TCPA "does not abrogate or lessen any other defense,

---

[10] *See* Tex. R. Civ. P. 94 ("In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.").

remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions," *see* Tex. Civ. Prac. & Rem. Code § 27.011(a), appellees may assert affirmative defenses to his motion to dismiss.

Although appellees' argument is novel, it is unpersuasive. The TCPA is intended to encourage and safeguard the exercise of citizens' constitutional rights, *id*. § 27.002, and we are instructed to construe the act "liberally to effectuate its purpose and intent fully," *id*. § 27.011(b). Section 27.005(c) addresses the assertion of an affirmative defense, explaining that such a defense may be grounds for dismissal even if the plaintiff carries its prima-facie-case burden. *See id*. § 27.005(d). It does not, however, provide that the plaintiff may assert an affirmative defense against a defensive TCPA motion. Indeed, it would stymie the TCPA's intended purpose if appellees, who did not meet their burden of establishing a prima facie case of their claims, could claim "affirmative defenses" to bar Amini from seeking TCPA relief. Further, we disagree that Amini's so-called "acceptance" of "the benefit" of the sound wall—appellees' early attempt to abate the noise problems—somehow barred him from making later complaints when the noise resumed due to appellees' activities in an area beyond the reach of the wall and, moreover, barred him from seeking TCPA remedies when sued for his renewed complaints. We also disagree with appellees' circular argument that Amini's ongoing campaign of making complaints amounted to "unclean hands" such that he cannot mount a TCPA defense when sued for that very conduct. If the trial court premised its failure to grant Amini's TCPA motion on appellees' assertion of their "affirmative defenses," such a decision was erroneous.[11]

---

[11] Having determined that Amini established that the TCPA applied and that appellees did not carry their burden of showing a prima facie case of each element of each claim, we need not consider whether Amini established his own asserted affirmative defenses.

*Sanctions*

Finally, we turn to appellees' motion for sanctions, in which they argue that Amini made false statements to this Court and the trial court in an attempt to "improperly exclude evidence vital and material to" appellees' arguments.

Amini and appellees filed their briefs in June and August 2018, respectively. In Amini's brief, he stated, "Plaintiffs provided Amini with an affidavit from Heyer and a second affidavit from Benaryeh, but both are absent from Plaintiffs' filed response in the Clerk's Record." In his reply brief, filed in early September, Amini reiterated his argument that the "Heyer affidavit is not part of the clerk's record, and the Court should not consider it." On September 12, appellees sent a letter to the trial court clerk asking for a supplemental clerk's record containing Heyer's affidavit and Benaryeh's declaration and explaining that those documents were filed in the trial court as exhibits to appellees' response to Amini's TCPA motion but omitted from the clerk's record. Amini objected to the inclusion of those exhibits in the appellate record, both in this Court and in the trial court, stating that "the trial court's records show Appellees did not file those two exhibits with Appellees' response to Amini's motion to dismiss" and "did not otherwise submit the exhibits to the trial court before it denied Amini's motion to dismiss by operation of law."

Appellees then filed a motion for sanctions, asserting that Amini's letters objecting to the supplementation of the record were demonstrably false, filed in bad faith, and an attempt to gain an unfair advantage through deceit. They argue that Amini "actually knows" that the two documents were filed with appellees' TCPA response but omitted from the clerk's record due to clerical error and that Amini was citing to a version of the clerk's record "he knows to be faulty and inaccurate" to give us an "incomplete and false version of the trial court record."

24

Appellees use words like "egregious," "opportunistically and dishonestly," and "subterfuge" to describe Amini's conduct related to the omitted documents. Amini has responded, stating that his objection letters "were accurate" and made in good faith. He notes that although he had pointed out the documents' omission from the record in his briefing, appellees did not seek to have the record supplemented before filing their brief and instead attached a copy of Heyer's affidavit in their appendix and cited to that document throughout their brief.[12]

We have reviewed the parties' filings related to sanctions, the clerk's records (both original and supplemental), and the reporter's record from a hearing on the parties' motions to dismiss and motion to strike. We note that the record before us demonstrates significant gamesmanship even by TCPA standards, including by appellees in their filings related to how the TCPA should be applied,[13] and we refuse to participate in such behavior. Having considered the issues fully, we deny appellees' motion for sanctions.

**CONCLUSION**

We have held both that Amini carried his burden of showing that the TCPA applied to all of appellees' claims and that appellees did not carry their burden of showing a

---

[12] It is true that appellees referred to Heyer's affidavit only through citations to their appendix, whereas many of their other citations are to documents as included in the clerk's record. However, appellees also cited to the appendix version of at least one document that was included in the clerk's record, and so their citing to the appendix version of Heyer's affidavit is not especially noteworthy.

[13] As we have noted, appellees filed in the trial court a "Motion to Dismiss the Defendant's Motion to Dismiss Under the TCPA, Under the TCPA." In addition, appellees filed in this Court a motion to dismiss Amini's appeal under the TCPA, asserting that the appeal was a legal action related to their exercise of their rights to petition and free speech. We denied that motion to dismiss the appeal, explaining that the TCPA does not authorize an appellate-level motion to dismiss. *See Amini v. Spicewood Springs Animal Hosp., LLC*, 550 S.W.3d 843, 845-46 (Tex. App.—Austin 2018, no pet.). As the legislature seems to have acknowledged by its recent changes to the Act, at some point the TCPA circular firing squad has to stop.

25

prima facie case of at least one essential element of each claim. We therefore reverse the trial court's denial of Amini's motion to dismiss by operation of law and render judgment granting his motion. Because the issues of attorney's fees and sanctions under the TCPA remain, we remand the cause to the trial court for further proceedings consistent with this opinion and the TCPA. *See* Tex. Civ. Prac. & Rem. Code § 27.009.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Triana and Smith

Reversed and Remanded

Filed: November 7, 2019