# IN THE SUPREME COURT OF TEXAS

═══════════

No. 19-0545

═══════════

REGENCY FIELD SERVICES, LLC, ET AL., PETITIONERS,

v.

SWIFT ENERGY OPERATING, LLC, RESPONDENT

═══════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

═══════════

**Argued December 3, 2020**

JUSTICE BOYD delivered the opinion of the Court.

JUSTICE GUZMAN did not participate in the decision.

> Upon the wicked he shall rain snares, fire and brimstone, and an
> horrible tempest: this shall be the portion of their cup.[1]

Brimstone—more commonly (but perhaps less captivatingly) known as sulfur[2]—has long been associated with death, destruction, and devastation. Yet the element, used in chemical weapons as early as ancient Greece,[3] exists naturally with the gas and petroleum that lay in abundance below the surface of our state. As natural gas is drawn to the surface, sulfur—in the form of hydrogen sulfide—often arrives with it. In this case, a mineral estate lessee alleges that

---

[1] *Psalms* 11:6 (King James).

[2] *See, e.g.*, *Psalms* 11:6 (New International).

[3] *See* 2 EDWARD GIBBON, THE HISTORY OF THE DECLINE AND FALL OF THE ROMAN EMPIRE 291–92 (John Bagnell Bury ed., Liberty Fund, Inc. 2011) (1906).

hydrogen sulfide an operator injected back into the earth has migrated beneath the surface and injured the lessee's interests in the minerals underlying nearby properties.

This appeal concerns the specific issue of when, for purposes of the statute of limitations, the lessee's claims accrued. More specifically, the issue is whether the pleadings and summary-judgment evidence conclusively established that the lessee's claims accrued at least two years before the lessee first filed them. The trial court held they did. The court of appeals reversed in part, holding that limitations bars the lessee's claims for injuries to its interests in one of its nine separate leases, but does not bar the lessee's claims for injuries to its interests in the other eight leases.

We conclude that the pleadings and evidence did not conclusively establish whether or when the lessee sustained any legal injury as a result of the defendant's alleged wrongful conduct. Because of this conclusion, and in light of the lessee's arguments in this Court, we need not decide whether the lessee's claims accrued separately on a lease-by-lease basis. Even assuming they all accrued when the defendant's alleged wrongful conduct first caused the lessee to suffer a legal injury, the pleadings and evidence do not conclusively establish that the first legal injury occurred more than two years before the lessee filed its claims. We thus reverse the court of appeals' judgment in part and remand the case to the trial court for further proceedings.

## I.
### Background

Natural gas is either "sweet" or "sour." Sour gas, which contains high levels of hydrogen sulfide, is "unfit for use in generating light or fuel for domestic purposes." TEX. NAT. RES. CODE

§ 86.002(8).[4] Often described as smelling like rotten eggs, hydrogen sulfide is extremely "poisonous, corrosive, flammable, and explosive." *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 6 n.14 (Tex. 2014). Among other things, it contaminates hydrocarbons and destroys wells and equipment used to produce them.

Natural gas producers can treat sour gas to remove the hydrogen sulfide. But then they must carefully dispose of it. Sometimes they burn (or "flare") it off or haul it away to a disposal site. But they may also dispose of it by injecting it through a well into a depleted subsurface reservoir. *See* 16 TEX. ADMIN. CODE § 3.9(1); *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 621 (Tex. 2011). Those who plan to operate such an injection well must first obtain a permit from the Texas Railroad Commission. *See* TEX. WATER CODE § 27.031. To obtain a permit, the operator must give notice of its application to all "interested" and "affected" persons, including the "operator of any well located within one-half mile of the proposed disposal well" and the "owners of record of each surface tract that adjoins the proposed disposal tract." *See* 16 TEX. ADMIN. CODE § 3.9(5).

Regency Field Services owns and operates a disposal injection well in McMullen County, known as the Tilden Acid Gas Injection Well. The permit Regency first received in 2007 allowed it to inject a particular amount of a hydrogen-sulfide/carbon-dioxide mix (called "injectate") into the Wilcox geological formation, a long-depleted gas field that runs horizontally around 5,800 feet beneath the surface. Above the Wilcox formation, around 5,000 feet beneath the surface, lies the Carrizo aquifer, one of the state's largest water sources. Below the Wilcox lie the Olmos formation

---

[4] *See also* TEX. NAT. RES. CODE § 86.002(9) (defining "sweet gas" as "all gas except sour gas and casinghead gas"); *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 703 n.6 (Tex. 2008) (comparing sweet and sour gas).

(around 9,400 feet deep) and the Eagle Ford formation (around 11,000 feet deep), two of the state's highest-producing natural-gas fields. Impermeable layers of shale separate the Wilcox from the formations above and below it, but injectate placed into the Wilcox will spread horizontally away from the injection point over time. The Railroad Commission granted Regency a permit to operate the Tilden injection well based on models predicting that the injectate "plume" would take forty years to migrate 2,220 feet.

In 2011, Regency applied for an amended permit allowing it to increase the amount of injectate it placed into the Tilden injection well. Regency's application included new models predicting that, at the increased disposal rate, the plume would take thirty years to migrate 2,900 feet from the injection point. The Commission granted the application and issued the amended permit in February 2012.

About six months later, Layline Petroleum discovered hydrogen sulfide in one of its wells located 3,300 feet from Regency's injection well. Layline's well—the JCB Horton #1—was located on the Quintanilla Ranch, a 4,200-acre tract adjacent to the land on which the injection well is located. The Horton #1 well produced gas from the Olmos formation, so its wellbore necessarily traveled through the Wilcox formation. Studies confirmed that the hydrogen sulfide discovered in the Horton #1 well came from Regency's injection well. As a result of the contamination, Layline had to cap and plug the Horton #1 well and perform other remedial measures. Regency temporarily shut in the injection well while it performed its own remedial measures. The Railroad Commission then authorized Regency to resume operating the injection well, but at reduced injection rates and pressure.

4

Swift Energy Operating holds nine mineral leases covering different depths underlying separate tracts near Regency's injection well. One lease—the PCQ lease—covers all of the Quintanilla Ranch except for certain areas previously leased to others, including the area on which the Horton #1 well was located. The PCQ lease gives Swift the right to explore and produce all of the minerals under and around the Horton #1 well, which already existed when Swift obtained the PCQ lease in 2009. So to reach the Horton #1 well, the hydrogen sulfide injectate necessarily had to physically migrate through some area under the Quintanilla Ranch where Swift holds the mineral lease. Swift's other eight leases cover various depths under separate tracts located north and east of Regency's injection well. On October 23, 2012, Layline notified Swift that Layline had to plug the Horton #1 well because of the hydrogen sulfide contamination. A revised modeling study that Regency obtained in 2013 showed that the hydrogen sulfide may have crossed under the surface boundary of the Quintanilla Ranch as early as April 2009.

In July 2014, the Quintanilla family and others filed this suit against Regency. Other nearby property owners intervened as plaintiffs that same month. Swift intervened on September 24, 2015, more than three years after Layline first discovered hydrogen sulfide at the Horton #1 well. After settling with the Quintanillas and the other claimants, Regency moved for summary judgment on Swift's claims based on limitations. The trial court granted Regency's motion and dismissed Swift's claims. Swift appealed, and the court of appeals affirmed in part and reversed in part. *Swift Energy Operating, LLC v. Regency Field Servs. LLC*, 608 S.W.3d 214 (Tex. App.—San Antonio 2019).

The court of appeals held that Regency was entitled to summary judgment to the extent Swift's claims are based on its interests under the PCQ lease because the evidence established that

"the injectate plume had crossed the PCQ lease's western border and into Swift's PCQ lease" no later than October 2012. *Id.* at 220. But because the evidence did not establish whether or when the injectate "breache[d] the boundary" of the tracts covered by the other eight leases or when it first "substantially interfere[d]" with Swift's rights under those leases, the court reversed the summary judgment to the extent Swift's claims are based on injuries to its interests under the other leases. *Id.* at 221–22. Both Regency and Swift filed petitions for review in this Court, which we granted. Together, the petitions present the issue of whether, for purposes of its summary-judgment motion, Regency conclusively established that Swift's claims asserting injuries to its interests under the PCQ lease or under its other leases accrued more than two years before Swift first filed its claims.

## II.
## Accrual Rules

We begin by reviewing the rules that govern accrual of a legal claim for purposes of applying a statute of limitations. Statutes of limitations

> afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise.

*Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990). The parties here agree that the applicable limitations statute required Swift to file suit against Regency within two years after its claims accrued.[5] As we explain, the legal-injury rule determines when an injured party's claims

---

[5] *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a) (requiring suit for trespass, conversion, or taking of property be brought "not later than two years after the day the cause of action accrues").

accrue, and the single-action rule requires the party to bring all claims arising from the defendant's wrongful conduct in a single legal action. Although we have recognized exceptions to these general rules, Swift does not rely on any exceptions for purposes of this appeal.

## A.     The legal-injury rule

Generally, a claim accrues when the defendant's wrongful conduct causes the claimant to suffer a legal injury,[6] which gives the claimant the right to seek a judicial remedy.[7] *Am. Star Energy & Mins. Corp. v. Stowers*, 457 S.W.3d 427, 430 (Tex. 2015).[8] Once the defendant's wrongful conduct causes a legal injury, the injured party's claims based on that wrongful conduct accrue— and the limitations period begins to run—even if (1) the claimant does not yet know that a legal injury has occurred,[9] (2) the claimant has not yet experienced, or does not yet know the full extent of, the legal injury,[10] (3) the claimant does not yet know the specific cause of the injury or the party

---

[6] *Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 834 (Tex. 2018) (per curiam); *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 721 (Tex. 2016); *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998); *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996); *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990); *Stillwell v. City of Fort Worth*, 169 S.W.2d 486, 487 (Tex. 1943).

[7] *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 591 (Tex. 2017); *ExxonMobil Corp. v. Lazy R Ranch, LP*, 511 S.W.3d 538, 542 (Tex. 2017); *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 202 (Tex. 2011); *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 279 (Tex. 2004); *Murray*, 800 S.W.2d at 828; *City of Abilene v. Downs*, 367 S.W.2d 153, 160 (Tex. 1963).

[8] *See Archer v. Tregellas*, 566 S.W.3d 281, 289–90 (Tex. 2018); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003); *see also Hous. Water-Works Co. v. Kennedy*, 8 S.W. 36, 37 (Tex. 1888) (explaining claim accrues upon suffering a legal injury "by which is meant an injury giving cause of action by reason of its being an invasion of a plaintiff's right").

[9] *Schlumberger*, 544 S.W.3d at 834; *Town of Dish v. Atmos Energy Corp.*, 519 S.W.3d 605, 609, 612 (Tex. 2017); *Sw. Energy Prod.*, 491 S.W.3d at 721; *Provident Life*, 128 S.W.3d at 221; *Childs*, 974 S.W.2d at 36; *S.V.*, 933 S.W.2d at 4; *Moreno*, 787 S.W.2d at 351.

[10] *Lazy R Ranch*, 511 S.W.3d at 542–43; *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex. 1997).

7

responsible for it,[11] (4) the wrongful conduct later causes additional legal injuries,[12] or (5) the claimant has not yet sustained or cannot yet ascertain any or all of the damages resulting from the legal injuries.[13]

## B.      The single-action rule

Closely related to the legal-injury rule, the "single-action rule" recognizes that a defendant's wrongful conduct may breach multiple legal duties, produce multiple legal injuries, or cause multiple types of damages, and thus give rise to multiple causes of action. *See Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563–65 (Tex. 2014) (plurality op.) (explaining distinction between common meanings of "action," which "refers to an entire lawsuit or cause or proceeding," and "claims" or "causes of action" asserted within an action).[14] Because each claim or cause of action may allege different legal injuries, they could—at least in theory—each accrue at different times, even though they arise from the same wrongful conduct. But under the single-action rule, a defendant's wrongful conduct gives rise to a single, indivisible action in which the claimant must pursue all claims for all damages resulting from all injuries that arise from the wrongful conduct,

---

[11] *PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 93–94 (Tex. 2004).

[12] *Schlumberger*, 544 S.W.3d  at 834 ("[I]njuries that arise or develop after the legal injury are still deemed to have accrued on the same date as the legal injury that caused them."); *Atlas Chem. Indus., Inc. v. Anderson*, 524 S.W.2d 681, 684 (Tex. 1975).

[13] *Schlumberger*, 544 S.W.3d at 834; *Rincones*, 520 S.W.3d at 591; *Sw. Energy Prod.*, 491 S.W.3d at 721; *Provident Life*, 128 S.W.3d at 221; *Childs*, 974 S.W.2d at 36; *S.V.*, 933 S.W.2d at 4; *Murray*, 800 S.W.2d at 828; *Tenn. Gas Transmission Co. v. Fromme*, 269 S.W.2d 336, 338 (Tex. 1954); *Quinn v. Press*, 140 S.W.2d 438, 440 (Tex. 1940); *cf. Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 594 (Tex. 2016) (explaining distinction between a legal injury, the wrongful act (or "breach of a duty") that "gives rise to liability for the legal injury," and "the damages that may be awarded as compensation for the legal injury").

[14] *See, e.g.*, *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417–18 (Tex. 2020) (recognizing that the same wrongful conduct may support both defamation and business-disparagement causes of action but distinguishing between the two based on the type of damages alleged).

and those claims all accrue when the first such injury occurs. *Pustejovsky v. Rapid-Am. Corp.*, 35 S.W.3d 643, 646 (Tex. 2000).

In this case, for example, Swift asserted "causes of action" for trespass, negligence, gross negligence, and "nuisance,"[15] all allegedly caused by Regency's wrongful operation of the Tilden injection well. Generally, a negligence claim accrues when the defendant's negligent conduct causes any legal injury for which the claimant may obtain legal relief.[16] When the claimant alleges that the defendant wrongfully caused a nuisance, the claim accrues when the defendant's conduct

---

[15] In its original plea in intervention, Swift asserted only causes of action for trespass and negligence. It added causes of action for gross negligence and "nuisance" to its second amended plea, which it filed a few months before we clarified that "the term 'nuisance' refers not to a defendant's conduct or to a legal claim or cause of action but to a type of legal injury involving interference with the use and enjoyment of real property." *Crosstex*, 505 S.W.3d at 588. Although Swift continued to plead "nuisance" as a "cause of action" in its third amended plea, filed about two months after we decided *Crosstex*, it identified the "nuisance" as a particular injury, as it has continued to identify it in its briefs. Swift pleaded that the nuisance resulted from Regency's "conduct that was negligent, reckless, grossly negligent, intentional and unreasonable." We explained in *Crosstex* that "a defendant can be liable for causing a nuisance if the defendant intentionally causes it, negligently causes it, or—in limited circumstances—causes it by engaging in abnormally dangerous or ultra-hazardous activities." *Id.*

[16] Under the general legal-injury rule, for example, a claim that an attorney negligently gave faulty legal advice accrues when the "advice is taken" because that's when "injury is incurred." *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019). A claim that an insurance agent negligently failed to obtain coverage accrues when coverage is denied because that's when the claimant "sustain[s] injury." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex. 1998). A claim that a tax accountant negligently gave faulty advice accrues when the "advice is taken" because that's when the client "suffers legal injury." *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997); *see also Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex. 1967) (holding negligence claim against tax accountant "did not arise until the tax deficiency was assessed by the Commissioner of Internal Revenue" because "[p]rior to assessment the plaintiff had not been injured"). A claim for negligent design or construction accrues "as soon as the owner suffers some injury." *Trinity River Auth. v. URS Consultants, Inc.-Tex.*, 889 S.W.2d 259, 262 (Tex. 1994). Early on, we explained that a negligence claim accrues at the time of the defendant's wrongful act when the act was not "itself lawful" and was itself "a legal injury . . . giving cause of action by reason of its being an invasion of a plaintiff's right." *Hous. Water-Works*, 8 S.W. at 37; *see also Quinn*, 140 S.W.2d at 441 ("A cause of action based upon negligence . . . accrues at the time of the wrongful act, and consequently limitation commences to run at that time and not at the time of the ascertainment of damages, if any."). As we later explained, this is true when, or "because," an unlawful, wrongful act itself causes or constitutes "a legal injury." *Trinity River Auth.*, 889 S.W.2d at 262; *see* Lonny Hoffman & Bret Wells, *The Exceptions Prove the Rule: Recalibrating the Discovery Rule and Equitable Fraud Exceptions to the Legal Injury Rule*, 71 BAYLOR L. REV. 63, 76 (2019) ("If the attempted distinction that *Houston Water-Works* tried to draw between originally lawful and unlawful acts feels convoluted and unworkable, it certainly was. But the court kept citing the case—and still does, to this day, though it has largely paid only lip service to the antiquated distinction. Instead, the case has come to be understood more basically as articulating the modern conception of the legal injury rule—that a cause of action accrues when a wrongful act causes some legal injury.").

"first 'substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities,'" because that's when the nuisance (the legal injury) first occurs. *Town of Dish*, 519 S.W.3d at 609 (quoting *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 153 (Tex. 2012) (in turn quoting *Schneider*, 147 S.W.3d at 269–70)).[17] And a claim for trespass to non-possessory property rights under a mineral lease (as Swift asserts here) arises when the defendant's unauthorized conduct first invades or interferes with the claimant's legal rights "to explore, obtain, produce, and possess the minerals subject to the lease," because that invasion or interference constitutes the actionable legal injury.[18] *Lightning Oil*, 520 S.W.3d at 49.[19]

---

[17] *See also Crosstex*, 505 S.W.3d at 600 (confirming definition of "nuisance" as a legal injury).

[18] By contrast, a trespass claim alleging unauthorized physical entry upon the claimant's land or other invasion of a possessory property interest generally accrues when the unauthorized entry occurs, even if the entry does not cause a discernable injury or damages. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 49 (Tex. 2017); *see also Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 11 n.28 (Tex. 2008). This is because the violation of the claimant's exclusive possessory right itself constitutes an "injury to the right of possession" for which the claimant is authorized to seek a judicial remedy. *Coastal Oil*, 268 S.W.3d at 9 (quoting *Pentagon Enters. v. Sw. Bell Tel. Co.*, 540 S.W.2d 477, 478 (Tex. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.)); *see also id.* at 12 n.36 (quoting *McDaniel Bros. v. Wilson*, 70 S.W.2d 618, 621 (Tex. App.—Beaumont 1934, writ ref'd)) (referring to claimant as the "injured party" even "if no damage is done or the injury is slight"). We have not decided whether subsurface migration can cause an actionable trespass to a surface owner's possessory interest in the subsurface space. *See Env't Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 416 (Tex. 2015) (declining to decide "whether deep subsurface wastewater migration is actionable as a common law trespass in Texas"); *FPL Farming Ltd. v. Env't Processing Sys., L.C.*, 351 S.W.3d 306, 314–15 (Tex. 2011) (declining to decide "whether subsurface wastewater migration can constitute a trespass, or whether it did so in this case"); *Coastal Oil*, 268 S.W.3d at 12–13 (same). We need not decide that issue here either, because Swift asserts claims for trespass to its nonpossessory rights as a mineral lessee (which we did recognize in *Lightning Oil*), not to possessory rights as a landowner.

[19] We also held in *Lightning Oil* that "the loss of minerals [a lessee] will suffer by a well being drilled through its mineral estate is not a *sufficient* injury to support a claim for trespass" to the lessee's non-possessory property rights to the minerals subject to the lease. 520 S.W.3d at 51 (emphasis added). Relying on this language, Swift urges us to hold that subsurface migration of contaminants does not cause a legal injury to a mineral lessee until the contaminants "substantially" invade or interfere with the lessee's ability to exercise its rights under the mineral lease. We said in *Lightning Oil*, however, that a trespass occurs when the interference "infringes on the mineral lessee's ability to exercise [these] rights." *Id.* at 49. Because our holding in this case depends on *when*—rather than *the extent to which*—the injectate invaded, interfered with, or infringed on Swift's rights under its mineral leases, we need not further explore here when an invasion or interference could be too "insufficient" or "insubstantial" to constitute a legal injury.

10

Theoretically, at least, Swift could sustain each of these legal injuries to its interests in each of its nine leases at different times. For example, the migrating injectate could interfere with Swift's rights to explore and produce minerals under one of its leases before it interferes with those same rights under a different lease. We have not previously applied the single-action rule to claims involving separate injuries to separately titled real-property interests. But assuming the single-action rule applies to such claims, then—at least as our precedent has described it—the rule required Swift to bring all of its claims against Regency in one action, and limitations accrued as to all of the claims arising from legal injuries to all of the leases when the first of those legal injuries occurred. *See Schneider*, 147 S.W.3d at 278; *Pustejovsky*, 35 S.W.3d at 646; *Atlas Chem.*, 524 S.W.2d at 684.

## C. Exceptions to the rules

We have recognized a handful of exceptions to these general accrual rules. For example, when the discovery rule applies, the claims accrue not when the wrongful conduct first causes a legal injury, but when the claimant first "knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury." *S.V.*, 933 S.W.2d at 4. Similarly, "when a defendant has fraudulently concealed the facts forming the basis of the plaintiff's claim, limitations does not begin to run until the claimant, using reasonable diligence, discovered or should have discovered the injury." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999). In addition, claims asserting that a defendant's wrongful conduct caused temporary (as opposed to permanent) injuries to real property may accrue separately upon "each subsequent" (as opposed to "the first") resulting injury. *Gilbert Wheeler, Inc. v. Enbridge Pipelines*

11

*(E. Tex.), L.P.*, 449 S.W.3d 474, 478 (Tex. 2014).[20] And in other very limited circumstances, claims asserting distinct legal injuries may accrue at different times even though the same wrongful conduct caused the distinct injuries. *Pustejovsky*, 35 S.W.3d at 653 (recognizing this exception to the single-action rule only for "asbestos-related diseases resulting from workplace exposure").

Swift relied on exceptions in the trial court, arguing in response to Regency's summary-judgment motion that limitations does not bar its claims because Regency's wrongful conduct constitutes a "continuing tort" that caused only temporary injuries. *See Rincones*, 520 S.W.3d at 592 (describing the continuing-tort doctrine, which this Court has "neither endorsed nor addressed") (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 924 (Tex. 2013)). But Swift expressly abandoned these arguments in the court of appeals and in this Court, at least for purposes of this appeal. Thus, we do not address or decide when Swift first knew or should have known that Regency's wrongful conduct caused a legal injury, whether Regency fraudulently concealed any relevant facts, whether Swift's alleged legal injuries could be classified as temporary (as opposed to permanent), whether to recognize the continuing-tort doctrine, or whether to establish another exception to the single-action rule.

In particular, we need not and do not decide whether Swift's claims alleging separate injuries to its separate interests under separate leases covering minerals underlying separate tracts accrued separately at different times. As we explain below, the pleadings and evidence do not conclusively establish whether or when Swift first sustained *any* legal injury, so limitations does not apply even if the single-action rule does. As a result, and in light of Swift's arguments in this

---

[20] *See also Schneider*, 147 S.W.3d at 270 ("A permanent nuisance claim accrues when injury *first* occurs or is discovered; a temporary nuisance claim accrues *anew* upon each injury.").

Court, we need not and do not address whether the single-action rule required Swift to bring all of its claims involving all of its separate leases in the same action, and we do not decide that any exception to the legal-injury rule or to the single-action rule would or would not apply under these or similar facts.

## III.
## Summary Judgment and the Parties' Pleadings

Our analysis in this case is also constrained by the fact that we are reviewing a summary judgment, rather than a judgment after trial on the merits. Because a statute of limitations provides an affirmative defense, a defendant seeking summary judgment based on limitations must conclusively establish that the limitations period expired before the claimant filed suit. *Schlumberger*, 544 S.W.3d at 833–34.[21] To do this, the defendant must conclusively establish when the claimant's action accrued. *Id.*[22] A trial court may grant summary judgment based on limitations only if the defendant properly presents "deposition transcripts, interrogatory answers, . . . other discovery responses . . . pleadings, admissions, affidavits, stipulations of the parties, [or] authenticated or certified public records" showing "there is no genuine issue as to any material fact and the [defendant] is entitled to judgment as a matter of law" on the limitations defense. TEX. R. CIV. P. 166a(c).

Despite rule 166a's reference to "pleadings," the parties here dispute whether Regency could rely on the allegations contained in Swift's pleadings to support its summary-judgment

---

[21] *See also Justiss*, 397 S.W.3d at 153; *Knott*, 128 S.W.3d at 219–20; *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001); *KPMG*, 988 S.W.2d at 748; *Velsicol*, 956 S.W.2d at 530; *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979); *Zale Corp. v. Rosenbaum*, 520 S.W.2d 889, 891 (Tex. 1975) (per curiam); *Downs*, 367 S.W.2d at 160.

[22] *See also KPMG*, 988 S.W.2d at 748; *Downs*, 367 S.W.2d at 160.

13

motion. Regency argues that, in light of Swift's pleaded allegations, at least one of the legal injuries Swift alleges it sustained as a result of Regency's alleged wrongful conduct necessarily occurred more than two years before Swift filed its claims. Swift argues, however, that Regency cannot rely on Swift's pleaded allegations but instead must present evidence conclusively establishing when Regency's wrongful conduct caused Swift to sustain a legal injury. On this point, we agree with Regency.

As Swift correctly observes, pleadings generally do not qualify as summary-judgment "evidence," even when they are sworn or verified. *Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660–61 (Tex. 1995).[23] Clearly, a party cannot rely on its *own* pleaded allegations as evidence of facts to support its summary-judgment motion[24] or to oppose its opponent's summary-judgment motion.[25] But even in the summary-judgment context, pleadings "outline the issues," and courts may grant summary judgment based on deficiencies in an *opposing party's* pleadings. *Hidalgo*, 462 S.W.2d at 543.[26]

Here, Regency denies Swift's allegations that Regency engaged in wrongful conduct or that its conduct caused Swift to sustain legal injuries. But Regency sought summary judgment on an *affirmative defense*, arguing that—even assuming Swift's allegations were true—Swift

---

[23] *See also KPMG*, 988 S.W.2d at 749–50; *Clear Creek Basin*, 589 S.W.2d at 678; *Hidalgo v. Sur. Sav. & Loan Ass'n*, 462 S.W.2d 540, 543–44 (Tex. 1971).

[24] *See Hidalgo*, 462 S.W.2d at 543–44 (holding defendant's sworn pleadings did not constitute evidence supporting its summary-judgment motion).

[25] *See KPMG*, 988 S.W.2d at 750 (holding claimant's pleadings alleging fraudulent concealment did not constitute summary-judgment evidence to support that defense to limitations); *Laidlaw*, 904 S.W.2d at 661 (holding claimant's pleadings did not create a fact issue to preclude summary judgment).

[26] *See also Hidalgo*, 462 S.W.2d at 543 n.1 (noting that summary judgment may "be rendered, when authorized, [o]n the pleadings").

14

sustained one or more of its alleged legal injuries more than two years before Swift filed suit. *See Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex. 1991) ("[A]n affirmative defense is one of avoidance, rather than a defense in denial."). To prevail on its limitations defense, Regency did not have to establish its own liability by proving that it in fact engaged in wrongful conduct, that its conduct in fact caused Swift to sustain a legal injury, or when those events occurred. *See Justiss*, 397 S.W.3d at 153 ("To establish a limitations defense, the defendant must prove that a [legal injury] occurred, *if at all*, more than two years before the [claimant's] lawsuit.") (emphasis added).[27] Instead, for summary-judgment purposes, Regency could treat Swift's pleaded allegations as truthful judicial admissions[28] and rely on them to define the issues and determine whether Swift's claims necessarily accrued beyond the limitations period. *See, e.g., S.V.*, 933 S.W.2d at 11 (relying on claimant's pleadings to define the issues because she "specifically limited the period for which she is claiming damages"). So to determine whether Regency met its burden to conclusively establish that Swift sustained an alleged legal injury as a result of Regency's

---

[27] *See also Town of Dish*, 519 S.W.3d at 611 (considering pleadings and evidence to conclude that "*[a]ny* legal injury that occurred did so at least on completion of all the compressor stations in May 2008") (emphasis added); *Emerald Oil*, 348 S.W.3d at 205 (assuming the truth of plaintiffs' allegations that defendant's wrongful conduct caused a legal injury, "which we must for limitations analysis"), 206 (considering plaintiffs' pleadings and evidence to determine when plaintiffs "had actual knowledge of this *alleged* injury-causing conduct") (emphasis added); *Shah*, 67 S.W.3d at 845 (assuming truth of plaintiff's alleged standard of care and breach, which "dictate[] when limitations began to run"); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 885 (Tex. 1998) (deciding limitations issue without deciding whether plaintiffs' claims were valid under Texas law); *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997) (assuming the truth of the alleged wrongful conduct "for purposes of deciding the applicability of limitations); *cf. Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) ("[I]t would be impossible to determine the basis of a legal action . . . *without* considering the plaintiff's petition.").

[28] *See Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) (holding party's pleadings constituted a judicial admission that established when claim accrued).

15

alleged wrongful conduct at least two years before Swift filed its claims, we must consider both

"the summary judgment evidence and the pleadings." *Schlumberger*, 544 S.W.3d at 834.[29]

## IV.
## Accrual of Swift's Claims

Swift first asserted its claims against Regency by intervening in this action on September

24, 2015. We must decide whether Swift's pleaded allegations and the summary-judgment

evidence conclusively established that Swift first suffered a legal injury as a result of Regency's

alleged wrongful conduct on or before[30] September 24, 2013. We conclude that they did not.

### A.     Lease-by-lease accrual

We first address the court of appeals' holding that the statute of limitations bars Swift's

claims to the extent they allege injuries to Swift's interests under the PCQ lease but not to the

extent they allege injuries to Swift's interests under its other eight nearby leases. *Swift Energy*

*Operating*, 608 S.W.3d at 220–22. As explained, the court of appeals drew this distinction because,

in its view, the evidence established that "the injectate plume had crossed the PCQ lease's western

border and into Swift's PCQ lease" by October 2012, but did not establish whether or when the

injectate "breache[d] the boundary" of the tracts covered by the other leases or when it first

---

[29] *See also Fromme*, 269 S.W.2d at 337 (determining limitations "from the standpoint of pleadings and proof"), 338 (finding accrual date based on a "careful reading of respondent's pleadings and the evidence introduced in the case").

[30] *See Town of Dish*, 519 S.W.3d at 608 (stating defendant bore burden to prove that claims accrued "earlier than" two years before plaintiffs filed suit); *Lazy R Ranch*, 511 S.W.3d at 542 (explaining defendant seeking summary judgment bore burden to establish that claims accrued "outside the limitations period"); *Gonzales v. Sw. Olshan Found. Repair Co.*, 400 S.W.3d 52, 58 & n.13 (Tex. 2013) (holding evidence conclusively established that claims were "time barred because [claimant] brought them more than two years after discovering her injury," even though the "record is not clear on what specific date" that occurred); *Emerald Oil*, 348 S.W.3d at 203 (holding cause of action accrued "by August 1991").

16

"substantially interfere[d]" with those leases. *Id*. Regency argues that the court of appeals erred by applying this lease-by-lease analysis, and Swift does not disagree. We agree with Regency.

In the first place, the migration of the injectate beneath a surface border into the subsurface space covered by one of Swift's leases did not *necessarily* cause Swift to sustain a legal injury. As explained, a nuisance occurs when a condition "first 'substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities,'" *Town of Dish*, 519 S.W.3d at 609, and a trespass to a mineral lessee's non-possessory property rights occurs when wrongful conduct first invades or interferes with the claimant's legal rights to explore, obtain, produce, and possess the minerals, *Lightning Oil*, 520 S.W.3d at 49. Because the surface owner, and not the mineral lessee, owns the possessory rights to the space under the property's surface, *id.* at 47, the mere fact that contaminants have migrated into the subsurface space covered by a mineral lease does not itself establish that the lessee has sustained either of these legal injuries.

But more importantly, as we have explained, Swift's arguments in this Court do not require us to decide whether the single-action rule required Swift to bring all of its claims for all of its injuries to all of its interests under all of its leases in one single action or whether all of those claims accrued upon the occurrence of the first of those injuries.[31] Because Swift relies solely on the general accrual rules and does not urge any exceptions, we do not consider whether the single-action rule required Swift to bring all claims for all injuries to its interests under all of the leases

---

[31] *Compare Emerald Oil*, 348 S.W.3d at 207–08 (rejecting well-by-well accrual analysis when all damage to all wells was "caused by the same operator during the same period of time"), *with Lazy R Ranch*, 511 S.W.3d at 539, 543–44 (holding claims alleging surface contamination at four discrete tank-battery sites on a 20,000-acre ranch accrued at different times, based on when the defendant's conduct occurred).

in this one action, or whether these facts would trigger an exception (or justify recognizing a new exception) that would allow claim-splitting under these facts. Because Swift does not rely on the court of appeals' lease-by-lease approach to accrual, we assume that all of Swift's claims accrued when Regency's wrongful conduct first caused Swift to sustain a legal injury.

## B. Pleadings and evidence

Finally, we turn to the question of whether the pleadings and evidence conclusively established that Swift first sustained a legal injury on or before September 24, 2013. Consistent with the nature of limitations as an affirmative defense, Regency does not seriously contend that the *evidence* conclusively established that Swift sustained any legal injury, much less that it did so at any particular time. As Regency itself explains, it "has no interest in or desire to prove Swift suffered any legal injury or has any valid claim whatsoever." Regency does point to evidence that it drilled the injection well in 2006 and publicly announced in 2007 that the injectate from the Tilden well would eventually extend underneath the Quintanilla Ranch, that it began injecting the injectate in 2007 and then increased the injection rate in February 2012, that hydrogen sulfide from its injection well was discovered at the Horton #1 well in August 2012, that to reach that well the injectate necessarily traveled somewhere within the Wilcox formation under the Quintanilla Ranch on which Swift maintains the mineral lease, and that modeling studies showed that the injectate likely crossed under the Quintanilla Ranch's boundary as of early April 2009.

But even taking all of this evidence as true, it does not *conclusively* establish that the injectate has substantially interfered with Swift's use and enjoyment of its property interests, invaded or interfered with Swift's rights to explore and produce minerals under its leases, or caused Swift any other legal injury, or when it might have done so. In fact, Regency disputes that the

18

injectate has caused Swift any such legal injury. As Regency notes, the evidence establishes that at this point experts cannot determine precisely where the plume exists or where it may be heading, much less when it arrived or may get there. We agree with Swift that at this point the evidence does not conclusively establish that a legal injury has occurred or when it may have done so.

Regency also notes that when the contamination was discovered at the Horton #1 well in October 2012, Layline (the owner of that well) identified to Swift three of Swift's wells that Layline thought were also affected, and Swift later claimed that two of those wells were in fact damaged by the injectate. But Layline actually only advised Swift that its wells "seem very near this injection well" and "could be affected," and Swift identified the wells as damaged as of November 2015, not 2012. These facts and allegations do not conclusively establish that Swift sustained a legal injury before September 24, 2013.

Regency primarily relies not on the evidence but on Swift's pleaded allegations, arguing the allegations themselves, or at least when combined with the evidence, establish that Swift sustained an alleged legal injury before September 24, 2013. We do not agree.

In its plea in intervention, Swift based its claims on Regency's alleged wrongful conduct consisting of "the manner in which" Regency operated the Tilden injection well, specifically by injecting the hydrogen-sulfide/carbon-dioxide mix into the Wilcox formation such that it reached and contaminated the Horton #1 well forty years before it should have. According to Swift, Regency's conduct supports a trespass claim because Regency "willfully and intentionally continued to inject" the contaminants into the disposal well even though the injectate "is expanding at a much greater rate than [Regency] initially projected." It also supports Swift's negligence claim because Regency failed to "exercise the duty of due care to avoid degradation of Swift's wells,

19

groundwater aquifers, and reserves." This same alleged intentional and negligent conduct supports Regency's claim for nuisance. And according to Swift, it supports a claim for gross negligence because Regency acted with "conscious indifference to the rights, safety, and welfare of others."

Swift alleged in its pleadings that this wrongful conduct had already caused (by the time Swift filed its plea in intervention on September 24, 2015) and would yet cause (at some time after that date) a variety of legal injuries. As to legal injuries Swift had sustained *in the past*, Swift alleged that the hydrocarbons subject to its mineral leases "are already imperiled," and Regency's revised modeling study showed that the injectate "has already reached an area in which Swift has proven undeveloped reserves ("PUDs")." As a result, Swift alleged, it was already unable to "safely and economically develop these PUDs." Regency's conduct had created a nuisance because it had already "resulted in a condition that substantially interfered with Swift's private use and enjoyment of its mineral interests." And because Swift's lease interests were "in the path" of the plume's "inevitable expansion," Swift was already "taking substantial preventative measures" to protect those interests.

In addition, Swift alleged, Regency's wrongful conduct would cause Swift to sustain *future* legal injuries because the wells it had already drilled and the many it planned to drill on all of its leases were "located near" the injection well and "within the path of the accelerating" plume of contaminants. These contaminants, Swift alleged, were "expanding at an increased rate and pose significant and irreparable harm" to Swift's "mineral interests and other rights to hydrocarbons and groundwater contained in reservoirs, formations, and aquifers in the [injectate's] path." As a result, any of Swift's "existing or future wells that penetrate the Wilcox disposal zone will be subject to degradation and corrosion" and face "inevitable increased corrosion." The contaminants

will "continue to expand" and will in the future "reach several more of Swift's PUD locations." Drilling the planned future wells will cost more to implement safety measures and protect equipment from corrosion and may be too dangerous or too expensive to drill at all. Swift's interests in the groundwater aquifers "will be damaged" by the expanding plume, which will also "corrode and degrade Swift's wellbore and pressure control devices," "impair Swift's hydrocarbon production," contaminate Swift's "hydrocarbon and water resources," corrode "its production wells," and cause "devaluation of its reserves." In short, as to future injuries, Swift alleged it will be unable "to safely and economically develop these PUDs."

As a result of these past and future legal injuries, Swift alleged that it "has suffered and will continue to suffer damage to its property interests, including several PUDs in the area of the injectate," resulting in monetary damages Swift later alleged total over $1 million. Swift alleged that its past damages included costs Swift had already incurred "related to investigation of enhanced safety measures to detect unsafe levels of [hydrogen sulfide]," periodic sampling of its well, and the then-present diminution in value of its PUDs. Future damages would result because Swift would have to drill future wells at "a much higher cost and risk" and possibly lose its drilling rights altogether, and its "inability to safely and economically develop these PUDs will have a significant economic impact on Swift." Swift sought to recover "the value of the lost reserves, and/or the increased cost of drilling wells through" the Wilcox formation, as well as "reimbursement for any undiscovered damage caused to its [well] casing" as a result of the injectate and "the increased costs and expenses that it will incur in the future to plug and abandon the wells endangered by the injectate." Swift also sought injunctive relief to prevent some of the future injuries and damages.

For purposes of determining whether Swift's pleadings conclusively established that it suffered a legal injury on or before September 24, 2013, we need only consider the past legal injuries that Swift alleged. We conclude that the pleadings and evidence did not conclusively establish that Swift sustained a legal injury by that date.

Swift did not allege that the injectate plume had already reached or damaged any of its existing wells or any of the specific sites where it planned to drill additional wells. But it clearly did allege that it had already suffered legal injuries before it filed its claims on September 24, 2015. Specifically, Swift alleged that because its interests were "in the path" of the expanding plume and that contamination was "inevitable," its interests were "already imperiled," it was already unable to "safely and economically develop these PUDs," the migrating plume "substantially interfered" with its use and enjoyment of its mineral interests, and the value of its PUDs were already diminished.

But its pleadings did not allege or establish *when* those past legal injuries occurred. In particular, Swift did not allege whether its past injuries occurred before September 24, 2013, or at some point between that date and the date Swift first filed its claims on September 24, 2015. The only allegation we have found that comes close to specifying a date by which an injury occurred is Swift's allegation—apparently in support of its assertion that its mineral-lease interests were "already imperiled"—that Regency's revised plume model showed that the injectate "has already reached an area in which Swift has proven undeveloped reserves." This allegation apparently refers to a modeling study prepared by Dr. Liaqat Ali and presented at a Railroad Commission hearing in October 2013, which concluded that the injectate may have crossed under the Quintanilla Ranch's boundary in April 2009. But the pleadings do not clearly and unequivocally allege

whether Swift's interests became "imperiled" when the plume first crossed under the boundary and reached the PUD area or at some time thereafter. *Wolf*, 44 S.W.3d at 568 (noting that a judicial admission must be "clear and unequivocal" to have a "conclusive effect").

To be clear, the statute of limitations may very well bar Swift's claims. At trial, or perhaps even on a subsequent summary-judgment motion after further pleadings and discovery, Regency may prevail on that point. Or it may be that Swift has yet to sustain any legal injury at all, and thus has no present right or authority to any legal relief. But at this point, the pleadings and evidence do not conclusively establish that Regency's alleged wrongful operation of the Tilden injection well caused Swift to sustain a legal injury before September 24, 2013.

## V.
## Conclusion

Because the pleadings and evidence do not conclusively establish that Regency's alleged wrongful conduct caused Swift to sustain a legal injury before September 24, 2013, we conclude that Regency did not establish a right to summary judgment based on limitations. The court of appeals erred in holding that Regency is entitled to summary judgment on Swift's claims for injuries to its interests in the PCQ lease. We reverse that part of the court of appeals' judgment granting summary judgment and remand the case to the trial court for further proceedings.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: May 7, 2021

23